### III

**In re M.D.**

**L.D., Appellant.**

**No. 97–FS–712.**

District of Columbia Court of Appeals.

Submitted Feb. 17, 2000.
Decided Aug. 24, 2000.

Williams, Assistant Corporation Counsel, were on the brief for appellee District of Columbia.

David P. Hayes, Washington, DC, appointed by this court, entered an appearance for appellee, M.D.

Before SCHWELB, RUIZ and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant, L.D., ·challenges the trial court's determination that she neglected her son, M.D. The court based its neglect finding on L.D.'s admissions about the medical care which she gave M.D. for his persistent eczema. Apart from L.D.'s own statements, no evidence was offered to establish that she had cared for her son improperly. In particular, no medical testimony was presented that L.D.'s treatment of M.D.'s eczematous skin condition was wanting, or that better treatment would have benefited M.D. On appeal L.D. argues that her "admissions" alone were insufficient to support the court's finding of medical neglect.

We agree that the court's judgment was not supported by sufficient evidence. We therefore reverse the adjudication of neglect. We take this occasion, however, to emphasize not only the importance of competent medical evidence in a medical neglect case, but also the power and duty of the trial court in a neglect proceeding .to require augmentation of the evidentiary record when necessary to make an informed decision as to the best interests of the child before it.

Betty J. Clark, Washington, DC, appointed by this court, was on the brief for appellant L.D.

Joanne Robinson, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sharlene E.

## I. BACKGROUND

The petition filed by the District of Columbia in this case alleged that M.D. was a neglected child within the meaning of D.C.Code § 16–2301(9)(B), (C) and (D) (1997).[1] The District premised its theory

1. Under D.C.Code § 16–2301(9), the term "neglected child" is defined to include, *inter alia,* a child:

    (B) who is without proper parental care or control, subsistence, education as required by law, or other care or control

of neglect solely on the claim that L.D. had failed to provide adequate medical care for M.D.'s eczema, in part because L.D. had a crack cocaine habit.[2] At the factfinding hearing, however, the District called only two witnesses, L.D. and a social worker. The only other witness who testified at the hearing, also a layperson, was called by L.D. As we shall observe, the consequence of this extremely limited evidentiary presentation was a record remarkably devoid of material information.

The pertinent evidence may be summarized as follows. Before the institution of neglect proceedings, M.D. lived with his mother (L.D.), his maternal grandmother, four of his siblings, and his mother's boyfriend. On February 2, 1996, M.D.'s grandmother brought him to the Child and Family Services Division (CFSD) of the Department of Human Services (DHS) and stated that she was unable to care for him. M.D., who was then eleven months old, was observed to be suffering from eczema, an irritating skin condition which had developed into open sores from the child's scratching. The CFSD filed a neglect petition. M.D. was taken to St. Anne's Infants Hospital and subsequently placed in foster care.

Although it had the burden of proving that M.D. had not received proper care for his eczema, the District presented no medical evidence. In lieu of such evidence, the District relied primarily on L.D. herself. It is fair to say that the parties expended minimal effort at the factfinding hearing to elicit exactly how L.D. had cared for her son, but L.D. testified that she took M.D. to a doctor and treated him with cortisone cream as she had been instructed to do. L.D. said she did not know why the treatment did not prove effective. However, she admitted in passing that it "seemed like" she did not know how to apply the cortisone cream correctly, that she may have been "mistreating" M.D., and that she was "drugging," i.e., abusing drugs, during the time M.D. was in her care. Because so much rides in this case on the significance of L.D.'s admissions, we quote them verbatim. L.D. testified as follows:

> [M.D.] had a little slight problem like eczema on his face, and his legs, that I was not treating as well, I was not treating too well. And, I was taking him back and forth to the doctor to find out what can I really do, and they just kept giving me cream for him. And, *seemed like I don't know if I was doing it right,* or I don't know, but it seemed like it was not working for him. *So I guess I was mistreating him wrong. And, then plus I was drugging at that time, too, so you know.*
>
> * * *
>
> *I guess I wasn't putting the right cream*—when I took him to the doctor, they gave me some cortisone cream for him. Then they gave me two or three types of bottles of cortisone cream to put on him. They gave me one percent,

---

necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or

    (C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; or

    (D) whose parent, guardian, or custodian refuses or is unable to assume the responsibility for the child's care, control or subsistence and the person or institution which is providing for the child states an intention to discontinue such care. . . .

2. Although this claim of medical neglect was the basis of the petition, the District did not allege that M.D. was neglected within the meaning of D.C.Code § 16–2301(9)(F), which provides that a neglected child includes one "who has received negligent treatment or maltreatment from his or her parent, guardian, or other custodian." As used in subparagraph (9)(F), the terms "negligent treatment" and "maltreatment" are specifically defined to encompass medical neglect. *See* D.C.Code § 16–2301(24). No reason appears why the District did not proceed under subparagraph (9)(F) in this case.

they gave me five percent. They gave me 1.5 percent, and I mean, they telling me to put it different places. It seemed like it wasn't clearing up. ·I was bathing him like I was supposed to give him a nice rub down. It seemed like it wasn't clearing up the way it supposed to be.... They gave me written instructions as to how to use it and I did that, but it seemed like it just wasn't clearing up the way that they—I mean, I don't really know. I can't say I do know because I don't know for real about why it didn't clear up.... Took him back to the doctor, because he keep itching....

(Emphasis added.)

The District also relied upon the testimony of a DHS social worker, Patricia Johnson, that when she asked L.D. in May 1996 about M.D.'s condition, L.D. "indicated" that she had not taken her son to see a doctor. Johnson's memory of this conversation was vague, and she did not know the time period to which L.D.'s statement related.[3] Significantly, Johnson further testified that M.D. was still suffering from eczematous lesions when she saw him at St. Anne's Infants Hospital in July 1996— six months after M.D. had been removed from L.D.'s care.

The only other witness who testified at the factfinding hearing was Doris Jean Pickeral, one of L.D.'s neighbors. Pickeral testified that L.D. took M.D. to the doctor "quite a few times" and that "she had some type of ointment the doctor had gave her for his treatment." Pickeral said that she herself accompanied L.D. and M.D. to the clinic on three separate occasions.

In addition to the foregoing evidence regarding L.D.'s attention to M.D.'s eczema, there was undisputed evidence that L.D. was a long-time user of crack cocaine who was unable or unwilling to stop or to participate meaningfully in a drug treatment program. For the purposes of this opinion, it is not necessary to recite the evidence pertaining to L.D.'s drug usage in detail. Suffice it to say that L.D.'s comment, quoted above, that she was "drugging" during the period when she was unsuccessfully treating M.D.'s eczema, was the sole evidence—such as it was—that L.D.'s drug abuse impaired her ability to care for her son.[4]

Because no physician testified and M.D.'s medical records were not introduced, there was no evidence as to the duration, seriousness and extent of M.D.'s eczema when he came to the attention of the CFSD in February 1996. There was no evidence as to the proper course of treatment for eczema, or the effectiveness of such treatment, or whether M.D.'s eczema was amenable to treatment. There was no medical evidence, in short, establishing that L.D. did anything wrong in treating M.D.'s skin condition, or that she failed to follow a medically appropriate regimen.

---

**3.** Johnson testified that "I'm not sure of a period of time and I don't know if my question was specific to a date or anything."

**4.** L.D. insisted that her crack cocaine habit did not interfere with her care for M.D. She testified that although she was unemployed and did not receive public assistance, M.D.'s medical expenses were covered by Medicaid. L.D. further testified that she limited her drug use to weekends, did not use drugs at home, and never returned home intoxicated or high. She said that on those occasions when she was out of the house using drugs, her mother would care for M.D. L.D.'s neighbor, Pickeral, testified that she was at L.D.'s house nearly every other day, often helped take care of the children, and never saw them left alone. Pickeral also stated that L.D. fed her children three meals a day, clothed them, and provided them with attention and affection, reading them stories, playing games with them, and sharing other activities with them. This testimony of L.D. and Pickeral, though it might be received with skepticism, was unrebutted.

The District did apprise the trial court that some of L.D.'s other children were found to be neglected in an earlier proceeding, in which L.D.'s drug use was at issue. The court ruled, however, that the adjudication of neglect with respect to L.D.'s other children was not relevant to this case.

At the conclusion of the hearing, the trial court expressed its dismay that the District's failure to present medical evidence severely hampered the court's ability to evaluate the claim of medical neglect.[5] Nonetheless, the court found that M.D. was a neglected child within the meaning of D.C.Code § 16–2301(9)(B) and (C).[6] In arriving at this conclusion, the court relied on L.D.'s supposed admissions that (in the court's words) "she was not providing the appropriate level and consistency of care that [M.D.] needed." The court stressed that "but for" L.D.'s admissions, it could not have made a finding of neglect:

> I am basing my finding on the testimony of [L.D.], the candid testimony of [L.D.] about her own view of the adequacy of her own care of this child and on her statements to the social worker where she acknowledged that she had not given adequate medical attention to this child.... [B]ut for those statements it seems to me that I couldn't conclude just based on the fact that this child had eczema with open wounds that that result—that that in and of itself is proof of medical neglect.

Although the trial court relied in part on L.D.'s statements to the social worker (Johnson), it found that L.D. had in fact taken M.D. to the doctor on some occasions for treatment of his eczema. Nonetheless the court found—"even without knowing the details about eczema which I would have liked to have known better"— that because M.D.'s eczema failed to improve, more visits to the doctor should have been made.

Based on L.D.'s admission that she was "drugging" at the time, the court also concluded that L.D.'s abuse of crack cocaine contributed to her failure to provide adequate medical care for M.D.[7]

## II. DISCUSSION

L.D.'s claim on appeal is one of evidentiary insufficiency. She argues that her statements constituted too weak a foundation, without more, to support the trial court's finding that M.D. was a neglected child. We agree and perforce reverse.

The burden was on the District to prove that M.D. was a neglected child by a preponderance of the evidence. *See In re N.H.*, 569 A.2d 1179, 1182–83 (D.C. 1990). In evaluating on appeal whether the District's proof complied with this standard, "we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re S.G.*, 581 A.2d 771, 774 (D.C.1990) (quoting *In re T.M.*, 577 A.2d 1149, 1151 (D.C.1990)). But if the trial court's judgment "is plainly wrong or without evidence to support it," we must set it aside. D.C.Code § 17–305(a) (1997).

In this case we must determine if there was sufficient evidence that M.D. was a neglected child within the meaning of D.C.Code § 16–2301(9)(B) and (C). Subparagraph (9)(B) required a showing that M.D. was deprived of "proper parental care ... necessary for his ... physical ... health"; and subparagraph (9)(C) required a showing that M.D.'s parent was

**5.** The court admonished the District as follows:

> I feel that I must say that I really believe that it would have been appropriate for the Government to introduce medical testimony in this case about the eczema ... I don't know exactly what the course of treatment for eczema should mean or the exact significance of these open wounds but—and I really think it was incumbent on the ...

Government to educate the Court about that.

**6.** See *supra* note 1. The court ruled that the District had not met its burden of proof with respect to subparagraph (9)(D) of § 16–2301.

**7.** Additionally, the court found that the inadequate care given M.D. was not attributable to a lack of financial means because M.D. had Medicaid coverage.

"unable to discharge ... her responsibilities" to M.D.[8] Under these provisions, the burden on the District was to establish that L.D. did not provide proper care, and that M.D. was harmed or threatened with harm as a result.[9] More specifically, the District's burden was to prove that the persistence or the severity of M.D.'s eczema was due to neglectful medical care by his mother.

We cannot conclude that the District shouldered this burden. According to the witnesses whom the trial court credited, L.D. took her son to the doctor on several occasions and treated his skin with the cortisone cream with which she was provided. The District proved only that M.D.'s eczema did not respond to L.D.'s ministrations. The District failed to present evidence, and therefore failed to prove, that the reason that M.D.'s eczema did not respond to his mother's care was that her care was improper. Cf. In re A.S., 643 A.2d 345, 348 (D.C.1994) (evidence of infant's dehydration, without more, insufficient to support a finding of statutory neglect).

To prove that the care which L.D. provided was inadequate and detrimental to M.D., expert medical testimony was required. Cf. District of Columbia v. Hampton, 666 A.2d 30, 35–36 (D.C.1995); Nimetz v. Cappadona, 596 A.2d 603, 606 (D.C.1991). Without medical testimony, the trial court could not evaluate whether

L.D. reasonably should have done more than she did, or whether M.D.'s condition would probably have improved if she had. The subject of proper medical treatment for eczema is not within "the realm of common knowledge and everyday experience," Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195, 200 (D.C.1991), such that the District could dispense with expert assistance in proving its case. The subject is too technical for the court to infer that L.D.'s efforts were insufficient merely because M.D.'s eczema did not respond favorably to them. Indeed, that inference was negated by the testimony of Johnson that M.D. continued to suffer from eczematous lesions even after he was treated at St. Anne's Infant Hospital.

■ In the absence of expert medical testimony, the trial court erred in resting its finding of neglect on what it construed to be L.D.'s own admissions that she had provided inadequate care to M.D. It is true that L.D.'s statements in court and to the DHS social worker constituted admissions of a party opponent. Party admissions do not require foundations to be admissible as substantive evidence; they need not have been made on personal knowledge and may be in opinion form. See Chaabi v. United States, 544 A.2d 1247, 1248 (D.C. 1988) (noting that basis of admissibility is that a party has ample opportunity to deny or explain admissions used against her); 2

---

**8.** See *supra* note 1.

**9.** Although the allegation that M.D. was neglected under § 16–2301(9)(C) was tied to L.D.'s drug abuse, the critical question under subparagraph (9)(C) was whether L.D. was "unable to discharge ... her responsibilities" to M.D. because of that drug abuse. Thus, as the trial court fully appreciated, it was not sufficient for the District merely to prove that M.D.'s parent was a crack cocaine user; the burden was on the District to prove the deleterious impact of that drug abuse on M.D. See 1 ANN M. HARALAMBIE, HANDLING CHILD CUSTODY, ABUSE AND ADOPTION CASES § 11.13, 591 (1993) ("Generally, the mere existence of a parent's alcoholism or substance abuse does not constitute grounds for a [neglect proceeding] unless the parent demonstrates an un-

willingness or inability to properly care for the child."). Neglect proceedings are remedial. See In re E.H., 718 A.2d 162, 169 (D.C. 1998); In re S.G., 581 A.2d at 775. "Such cases are not brought to punish the parent or child. Rather, they are brought ordinarily because the parent is not willing or able to fulfill parental responsibilities, thereby requiring government intervention to protect the child's best interests." In re J.J.Z., 630 A.2d 186, 191–92 (D.C.1993). "The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents...." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); accord, In re S.G., 581 A.2d at 778.

McCormick on Evidence §§ 255–56, 258 (5th ed.1999). As an abstract proposition it is therefore correct that a party's admission may obviate the necessity of other evidence, including otherwise essential expert witness testimony. But that L.D. made admissions that could properly be used against her begs the question of what it was she admitted.

L.D. did admit that her efforts to care for M.D. were unsuccessful, but she did not admit that her efforts were inappropriate. In her testimony, which was corroborated by Pickeral, L.D. stated that she took M.D. "back and forth" to the doctor, followed the doctors' written instructions, treated M.D. with different types of cortisone cream, bathed him "like I was supposed to" and gave him "a nice rub down." Despite doing these things, L.D. testified, her son's eczema did not clear up, and she did not know why. Taken in conjunction with that testimony, L.D.'s ambiguous self-criticisms—such as her "guess" that she was treating M.D. "wrong" and not using the "right" cream, and her comment that it "seemed like" she did not know if she was "doing it right"—cannot without more be deemed probative admissions either that she neglected her responsibilities to M.D. or that he was harmed as a result. Viewed in context, L.D.'s "admissions" were too problematical—too vague, unreliable and uncorroborated—to bear on their own the weight of the charge of medical neglect.[10]

Accordingly, we hold that the evidence before the trial court was insufficient to support the court's finding of neglect under either subparagraph (9)(B) or (9)(C) of D.C.Code § 16–2301.[11] The adjudication of neglect must be reversed.

Before addressing the question of what should happen on remand, we think it necessary to discuss the proper judicial response where, as here, the parties to a child neglect proceeding fail to present critical medical information. "The District's civil neglect statute ... is a remedial enactment designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end." *In re T.W.*, 732 A.2d 254, 258 (D.C.1999). Under our statutory regime, the court in a neglect proceeding acts as *parens patriae*. In that role the court has the "paramount" obligation and "broad authority" to protect the best interests of the child where the parent is unwilling or unable to do so. *Id.* This obligation "begins well in advance of any adjudication of neglect...." *In re J.J.Z., supra* note 9, 630 A.2d at 193.

To protect the best interests of the child before it, the court has a duty "to know as much as possible about the entire situation." *In re J.A.*, 601 A.2d 69, 76 (D.C. 1991). Thus we have emphasized that "[i]n determining whether a child's welfare requires the intervention of the state, the trial court's inquiry must go beyond simply examining the most recent episode." *In re A.S.*, 643 A.2d at 347 (internal quotation marks and citations omitted). We have directed the trial court in neglect proceedings to consider the "entire mosaic" of the child's history and experience relevant to the allegations of neglect. *Id; see also In re T.G.*, 684 A.2d 786, 788 (D.C.1996). In *J.J.Z.*, for instance, we held that where the government seeks to dismiss a neglect petition over the objection of the guardian *ad litem* for reasons

10. It is true that Johnson testified that L.D. "indicated" that she had not taken M.D. to see a doctor. Since the trial court found that L.D. did take her son to the doctor, L.D.'s purported "admission" to Johnson must be discounted.

It is also true that L.D. made the disturbing comment when she testified about her care of M.D. that she was "drugging" at the time. Nonetheless, that admission does not supply what was otherwise missing, evidence that L.D. was not discharging her responsibilities to M.D.

11. Our conclusion would be the same if the District had charged that M.D. was a neglected child under § 16–2301(9)(F), since that subparagraph requires evidence of negligent treatment or maltreatment. See *supra* note 2.

other than lack of proof, "the court must make an appropriate inquiry, including an evidentiary one if necessary, to determine whether the best interests of the child will be served by dismissal." *In re J.J.Z.*, 630 A.2d at 187.

■ It follows from these principles that the trial court in a neglect proceeding ought not to be passive in the face of what it recognizes is a deficient presentation of evidence. In such a case the court may and should take affirmative steps to ensure that it has enough evidence before it to make an informed decision. In this case it was the District's responsibility, in the first instance, to adduce the medical evidence necessary for the trial court to determine whether M.D. was receiving appropriate care from his mother. When neither the District nor the other parties to the factfinding hearing undertook to present such evidence, the trial court had the authority in its capacity as *parens patriae* to stay the proceeding and direct the District (or other appropriate party) to augment the record with medical testimony and M.D.'s medical records. Alternatively, the court was empowered by statute to order, on its own motion, a physical examination of M.D. and to utilize the results of that examination in the factfinding hearing. *See* D.C.Code § 16–2315. The neutral exercise of such powers to fill the evidentiary void in this case would not have placed the court in an adversarial posture vis-à-vis any of the parties and would therefore have been compatible with the judge's duty "to preside impartially and to appear to do so." *In re J.A.*, 601 A.2d at 76.[12]

Turning now to proceedings on remand, where the allegations of a neglect petition have not been established by a preponderance of the evidence, the trial court must ordinarily dismiss the petition, order the child released, and terminate the proceeding. *See* D.C.Code § 16–2317(b)(2). But since we have said that the trial court had the authority on its own initiative to require the presentation of medical evidence which would have helped it resolve whether M.D. was a neglected child, we do not believe that termination of the proceedings on remand is necessarily the proper course to follow in this case. On the other hand, given the lapse of time since M.D. was found to be a neglected child, and the fact that we know little of what has transpired in the interim, we are not in a position to say what further proceedings should ensue. We therefore leave it to the trial court and the parties to determine on remand whether the factfinding hearing should be reopened for the presentation of medical evidence, or whether circumstances have so changed that some alternative course of action would be appropriate. *Cf. In re T.G.*, 684 A.2d at 791 (staying mandate of termination upon reversal to permit the trial court and the parties to take such action "as the family's current circumstances and the children's best interest may require"); *In re S.K.*, 564 A.2d 1382, 1391 n. 14 (D.C.1989) (separate opinion of Schwelb, J.) ("Because a child's safety may be at stake, I would not preclude the government on remand from proving the truth of Children's Hospital's allegations in spite of the fact that it could have done so at the original hearing, for I am not prepared to insist on rigorous adherence to principles

12. Our endorsement of judicial authority to require augmentation of the record with medical evidence needed for an informed decision does not conflict with the holding of *J.J.Z.* that the trial court is not authorized to override a good faith decision of the Corporation Counsel to dismiss a neglect petition where that decision is based on the lack of sufficient evidence. *In re J.J.Z.*, 630 A.2d at 194. The rationale of that holding was that the statutory scheme "clearly vests" the decision not to proceed with a petition for lack of evidence in the Corporation Counsel, who shares *parens patriae* responsibilities to the child with the court. *Id.* In this case, however, the Corporation Counsel did not decide to dismiss the petition for lack of evidence (or any other reason), and the rationale of the holding in *J.J.Z.* is inapplicable.

of waiver or estoppel if that might augment the risk to S.K.'s life or well-being.").

*Reversed and remanded.*