In re KYA. B.,

In re K.B.,

and

In re Kye.B.

D.B., Appellant

No. 00–FS–1230, 00–FS–1231, 00–FS–1232.

District of Columbia Court of Appeals.

Argued Dec. 2, 2003.
Decided Sept. 9, 2004.

David J. Ontell, Washington, appointed by the court, for appellant D.B.

Robert S. Becker, Washington, appointed by the court, for appellees Kya.B., K.B., and Kye.B.

Sheila Kaplan, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief, for appellee District of Columbia.*

Before TERRY, Associate Judge, STEADMAN, Associate Judge, Retired,** and KING, Senior Judge.

TERRY, Associate Judge:

Appellant D.B. is the mother of three children, her daughter Kya.B. and her sons K.B. and Kye.B.[1] In this neglect proceeding, the trial court, after an evidentiary hearing, found that D.B. had abused Kya.B. and that Kya.B. was therefore a neglected child under D.C.Code § 16–2301(9)(A) (2001).[2] The court also found

---

* While this appeal was pending, the title of the District's chief attorney was changed. The Corporation Counsel is now officially known as the Attorney General for the District of Columbia. *See* Mayor's Order No.2004–92 (May 26, 2004), 51 D.C. Register 6052.

** Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on August 8, 2004.

1. At the time of the relevant events in this case, K.B. was approximately eight years old, Kya.B. was six and a half, and Kye.B. was three and a half.

2. D.C.Code § 16–2301(9)(A) (2001) provides:
   The term "neglected child" means a child ... who has been abandoned or abused by his or her parent, guardian, or other custodian[.]

that K.B. and Kye.B. were *neglected children* under D.C.Code § 16–2301(9)(E) (2001),[3] concluding that they were "in imminent danger of being abused" because their sibling, Kya.B., had already been abused. The court committed all three children to the custody of the Department of Human Services and directed Court Social Services to oversee their treatment plan and determine whether the children could be placed with other family members. D.B. contends that there was insufficient evidence to permit a finding that Kya.B. was abused and insufficient evidence to prove that K.B. and Kye.B. were in imminent danger of being abused. We affirm the trial court's order with respect to Kya.B and K.B. We reverse the order as to Kye.B. (the youngest child) and remand the case to the trial court for further proceedings.

I

On March 30, 2000, Kya.B. arrived at her elementary school with a small laceration over her left eye and an abrasion on her right arm. Kya.B's teacher brought her to the school nurse, Selinda Boyd, for examination and treatment. Kya.B. told Ms. Boyd that the laceration over her eye

occurred when her mother hit her "with a broom handle for not being able to locate her [school] uniform." The abrasion on Kya.B.'s arm was in the healing stages, and Kya.B. told Ms. Boyd that she had received that injury when her mother repeatedly pinched her during a hair grooming session for failing to hold her head straight. Boyd also noticed "old injuries, scratches around [Kya.B.'s] neck on both sides," in addition to the fresh injuries. Kya.B. said that the older injuries on her neck were inflicted by her mother when she had not held still during previous hair grooming sessions.

After examining Kya.B., Ms. Boyd called Child Protective Services, which immediately contacted the Youth and Family Services Division ("YFSD") of the Metropolitan Police. The next day, March 31, Detective James Goldring of YFSD took all three children to District of Columbia General Hospital for an examination. As reported by Detective Goldring,[4] Kya.B.'s examination "revealed multiple healing scars on her head, and revealed multiple healed scars to her arms, back, right shoulder, neck, and face." No scars were found on the other two children. Detective Goldring also interviewed Kya.B. and

An "abused" child, in turn, is defined in part as "a child whose parent, guardian, or custodian inflicts ... physical or mental injury upon the child, including excessive corporal punishment ...." D.C.Code § 16–2301(23) (2001).

After the events involved in this case, these definitions were amended by D.C. Law 14–206, 49 D.C. Register 7815 (2002); the amendments, however, have no effect on this appeal. The current versions are codified as D.C.Code § 16–2301(9)(a)(i) and (23) (2004 Supp.), respectively.

3. D.C.Code § 16–2301(9)(E) (2001) provides:
  The term "neglected child" means a child ... who is in imminent danger of being abused and whose sibling has been abused[.]

This definition was also amended by D.C. Law 14–206, 49 D.C. Register 7815 (2002), but the amendment has no effect on this case. Of particular relevance here, the phrase "in imminent danger of being abused" appears in both the original statute and the amended version, which is codified as D.C.Code § 16–2301(9)(A)(v) (2004 Supp.).

4. Detective Goldring testified at the initial hearing on April 1, but not at the second hearing three months later. Our summary of the information he provided is taken from the neglect petition, which he signed under oath, and which is consistent with his testimony at the April 1 hearing.

K.B. about their mother's methods of discipline:

> [Kya.B.] reported that her mother disciplines her with a belt, with her hand, or with a broom. She further reported that her mother also hits her brother [K.B.] with the belt, and that she hits [Kye.B.] with her hand. [K.B.] reported that his mother beats them with "belts, toys, brooms, and stuff." [K.B.] also reported that [Kya.B.] was beaten on Wednesday [March 29, 2000] because she could not find her school uniform.

Kya.B. told Detective Goldring that the old scratches around her neck were inflicted in January 2000 when D.B. grabbed her by the neck, choked her, and then threw her against the dresser in her bedroom because she could not locate a comb.

On April 1, 2000, the District of Columbia filed three neglect petitions against D.B. (one for each child). The petitions alleged that D.B. physically abused her daughter, Kya.B, and that D.B.'s sons, K.B. and Kye.B., were in imminent danger of being abused. The trial court held an initial hearing that day and ruled that there was probable cause to believe that Kya.B. had been abused and that her siblings were in danger of future abuse. The court denied D.B.'s request to regain custody of her children. Court Social Services recommended that the children be placed with their respective fathers (each child has a different father) or other relatives, and the court agreed. The court also ordered psychological evaluations of D.B. and her children and directed that D.B.'s visits with her children be supervised until further notice.

About three months later, a different Superior Court judge held an evidentiary hearing on the three neglect petitions. Only two witnesses testified on the issue of neglect, Ms. Boyd and D.B., the children's mother.[5] D.B. stated that she disciplined her children by "tak[ing] things from them" and by punishing them physically. She explained that the physical punishment was normally in the form of spankings, but that sometimes she used objects, such as belts, on the two older children, Kya.B. and K.B. D.B. denied ever using a broom handle to punish Kya.B. or any of her children and said she never saw any marks on her children's bodies after disciplining them.

Concerning the events of March 29, D.B. testified that Kya.B. returned home from school with notes from her teachers because she was "being bad in school." All three children soon began fighting with each other, and separating them from one another did not quell their dispute. In an effort to end the quarrel, D.B. "gave them all a spanking and told them to stop fighting." She also told Detective Goldring that she had struck Kya.B. with a belt and that the belt "may have" hit Kya.B. in the head because the girl "was moving around." Later in her testimony, however, she denied that possibility: "I hit her on the backside. I don't know how she could have got the bruise on her head. . . . I didn't even see the mark on her head. I didn't see it. So, no, I don't think I put it there. No." D.B. gave Kya.B. a bath later that night and did not notice any marks on her body.[6]

---

5. K.B.'s father testified briefly, but only to acknowledge that K.B. was in fact his son.

6. D.B. also stated that Kya.B. "constantly" failed to tell the truth and that Kya.B. and K.B. would often fight with each other.

"They punch, whatever, I have to separate them all the time." She admitted that had "seen injuries on [Kya.B.]," but those injuries, she said, were the results of "fights at school" and falls both at school and at home.

At the conclusion of the hearing, the court found that Kya.B.'s injuries—the laceration over her left eye, the abrasion on her right arm, and the scratch marks around her neck—were inflicted by D.B. The court attributed the laceration above the eye to D.B.'s physical discipline. The court also credited Ms. Boyd's testimony that Kya.B. had told her that her mother hit her with a broom handle because Kya.B. "was unable to locate her school uniform." The scratch marks on her neck and the abrasion on her arm were also inflicted by D.B., the court found, when Kya.B. "would not sit still or stationary while her mother combed her hair." In making these findings, the court noted that while "physical discipline is not outlawed . . . [t]he court certainly does not find appropriate the beating of a child with a broom stick handle, nor does the court find appropriate and lawful the scratching of a child around her neck as a means of discipline." The court cited D.B.'s admission that "she does discipline the children with objects such as the belt" as additional support for its findings. It then concluded that the two boys, K.B. and Kye.B., "are in imminent danger of abuse, based on the abuse that this court has found that this mother has inflicted upon her [daughter]," and thus that "the children are neglected pursuant to [D.C.Code § 16–2301(9)(A) and (E) ]."

At the ensuing disposition hearing, all three children were committed to the custody of the Department of Human Services. The court directed Court Social Services to oversee their treatment plan and determine whether the children could be placed with other family members. These appeals followed.

## II

■■ Appellant contends that the evidence was insufficient to support the trial court's finding that Kya.B. was abused because a finding of abuse requires cruelty of such a high magnitude "that court intervention needs little explanation." She suggests that Kya.B.'s injuries and scars stem from an isolated instance of excessive physical punishment and that one single incident is insufficient for a finding of abuse. These arguments misperceive both the law[7] and the facts[8] of this case.

■■■ "In a child neglect proceeding, the District [of Columbia] has the burden of proving by a preponderance of the evidence that a child is neglected within the meaning of D.C.Code § 16–2301." *In re E.H.*, 718 A.2d 162, 168 (D.C.1998); *accord, e.g., In re M.D.*, 758 A.2d 27, 31 (D.C.2000). In determining whether the government's proof complied with this standard, "we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re S.G.*, 581 A.2d 771, 774 (D.C.1990) (citations omitted). Only when the trial court's judgment "is plainly wrong or without evidence to

---

**7.** We have stated that "excessive corporal punishment" within the meaning of D.C.Code § 16–2301(23), *supra* note 2, is determined by "whether the physical force used . . . was 'reasonable under the facts and circumstances of the case.'" *In re G.H.*, 797 A.2d 679, 684 (D.C.2002) (citation omitted). Because our law uses a reasonableness standard for assessing excessive corporal punishment, there is no "level of magnitude" test as appellant maintains. *See Newby v. United States*, 797 A.2d 1233, 1243 (D.C.2002) (test is whether "the force used was immoderate or unreasonable").

**8.** The evidence showed that the excessive corporal punishment which led to the finding of abuse in this case was not an isolated incident.

support it" may we set it aside. D.C.Code § 17–305(a) (2001); *see In re G.H.,* 797 A.2d at 683–684; *In re M.D.,* 758 A.2d at 31.

Kya.B. was correctly found to be a "neglected child" because she was seriously injured by her mother's unreasonable physical abuse. Though physical or mental discipline of a child is permissible in appropriate situations, the discipline "must be reasonable under the facts and circumstances of the case." *In re L.D.H.,* 776 A.2d 570, 575 (D.C.2001) (citations omitted); *accord, In re G.H.,* 797 A.2d at 684 (citing *Carpenter v. Commonwealth,* 186 Va. 851, 861, 44 S.E.2d 419, 423 (1947) (punishment must be "within the bounds of moderation and reason")).[9] *See also Lee v. United States,* 831 A.2d 378, 380–381 (D.C. 2003) (rejecting claim by mother convicted of assault that she was exercising reasonable parental discipline when she struck her teenage daughter three times with a wooden dowel).

In this case we are satisfied that the evidence, viewed in the light most favorable to the government, was sufficient to permit the trial court to find by a preponderance that D.B. used unreasonable force against Kya.B. On March 30, when Ms. Boyd examined Kya.B., she had a fresh, bleeding cut over her left eye that was caused by her mother's striking her with a broom handle because she could not locate her school uniform. Kya.B. also had an abrasion on her arm that had been inflicted by her mother two days earlier, on March 28, when she would not sit still while her hair was being groomed. In addition, Kya.B. had scratch marks around her neck, again stemming from her mother's physical punishment during a previous hair grooming session. In short, there was evidence that on three separate occasions excessive corporal punishment by the child's mother had resulted in visible injuries—evidence of a pattern of excessive corporal punishment, not an isolated instance as appellant contends.

Also relevant is D.B.'s admission that she used objects such as belts to punish her two oldest children, and that she might strike them in places other than the backside if they were moving around while being hit. Furthermore, Kya.B. was sent to school while still bleeding from above her eye, a fact which suggests that D.B. was ignoring the laceration over the eye and thus not treating her daughter with the due care expected of a parent. Given all of these facts, the court could permissibly find that Kya.B. was a neglected child. Though D.B. denied causing any of the injuries that the school nurse observed on Kya.B.'s body, the court found her testimony incredible, as it was entitled to do. "Credibility determinations [are] for the judge, as the trier of fact, and we cannot second-guess them." *In re G.H.,* 797 A.2d at 684.

### III

Appellant contends that Ms. Boyd's testimony recounting Kya.B.'s statements to her, which described how Kya.B. was injured, should have been admitted only for "the purpose of showing why [Boyd] acted as she did" and should "not be admitted for the truth of the words" because the words were hearsay. At trial, however, appellant did not object to the admission of this testimony, and thus we review for plain error, if at all. *Jones v. United States,* 813 A.2d 220, 226 (D.C.2002); *Wil-*

---

9. The recently amended statute, *supra* note 2, is more explicit. It provides that discipline must be "reasonable in manner and moderate in degree" and that it "does not include" such actions as "burning, biting, or cutting a child," "striking a child with a closed fist," or "using [a dangerous] weapon on a child." D.C.Code § 16–2301(23)(B) (2004 Supp).

*liamson v. United States*, 445 A.2d 975, 980 n. 5 (D.C.1982); *cf. Eldridge v. United States*, 492 A.2d 879, 883 (D.C.1985) ("once hearsay evidence is admitted without objection, it may be properly considered by the trier of fact and given its full probative value" (citations omitted)); *accord, e.g., Scales v. United States*, 687 A.2d 927, 934 (D.C.1996). We find no plain error in the admission of Boyd's testimony; indeed, we find no error whatever.

Ms. Boyd's testimony concerning Kya.B's statements to her while receiving medical treatment would have been admissible under the medical diagnosis exception to the hearsay rule had an objection been made at trial. Though attributions of fault made to medical workers are generally excluded from the medical diagnosis exception, "statements [made to medical workers] about the cause of injuries fall within the medical diagnosis exception to the hearsay rule because explaining the cause of injuries may facilitate treatment." *Galindo v. United States*, 630 A.2d 202, 210 (D.C.1993) (citations omitted). In addition, "statements attributed to the victim seeking medical treatment relating to the 'psychological and emotional consequences' of the abuse, as well as the physical injuries, may also be admitted under the medical diagnosis and treatment exception to the hearsay rule." *Jones*, 813 A.2d at 227 (citation omitted). Such statements are relevant to treatment in preventing "a reoccurrence of the abuse." *Galindo*, 630 A.2d at 210; *see also Brown v. United States*, 840 A.2d 82, 90 (D.C.2004) (following *Galindo* ).

Kya.B.'s statements to Ms. Boyd in the instant case fall within the holdings of *Jones* and *Galindo*. D.B. is the mother of the abused child Kya.B. and lives with her in the same household. Boyd was the treating nurse when Kya.B. came to her office for treatment of a bleeding lacera-

tion above her eye. Identifying D.B. as the cause of Kya.B.'s injuries was thus pertinent to medical treatment and important in preventing the injuries from recurring. Because these statements would surely have been admitted under the medical diagnosis exception had appellant's counsel raised an objection, the trial court did not err.

## IV

Appellant and the guardian *ad litem* contend on appeal that the evidence does not support a finding that either K.B. or Kye.B. was in imminent danger of being abused. The trial court ruled that K.B. and Kye.B. were in imminent danger of being abused "based on the abuse that this court has found that this mother has inflicted upon her child, [Kya.B.]." Read in context, this appears to have been essentially a *per se* finding that because Kya.B. was abused, the other children in the same household were thus in imminent danger of being abused, and hence that they could be adjudicated neglected. Recently, however, in *In re Te.L.*, 844 A.2d 333, 343–344 (D.C.2004), we reiterated that there is no *per se* rule allowing a child to be adjudicated neglected (and thus to be removed from a home) simply because a different child within that home has been abused. A finding that a child is in imminent danger of being abused because another child in the same home has been abused "cannot be automatic." *Id.* at 342; *see In re S.G.*, 581 A.2d at 778. In other words, an adjudication of neglect under D.C.Code § 16–2301(9)(E) (2001), *supra* note 3—or under the amended version, D.C.Code § 16–2301(9)(a)(v) (2004 Supp.)—requires the court to make two separate and independent findings: first, that a sibling (or, since the amendment, another child in the same household) has been abused, and second, that the child in question is "in immi-

nent danger of being abused." Moreover, an individualized finding of imminent danger must be made for each child. A finding of imminent danger does not necessarily follow from the fact that a sibling has been abused. "Rather, the court must be apprised of the 'entire mosaic' ... and must address the risks attendant on removing a child from his home as well as those involved in keeping the child where he or she is." *In re Te.L.,* 844 A.2d at 344 (citation omitted).

■ The court's finding of neglect with regard to K.B., the oldest child, must be affirmed. There was evidence that D.B. was already physically mistreating him. D.B. admitted having beaten K.B. with a belt when he misbehaved and did not offer any reason for such a punishment. Because K.B. was suffering mistreatment at the hands of D.B. akin to that inflicted on Kya.B., the court had sufficient basis in the evidence to remove K.B. from D.B.'s care and custody.

■ The adjudication of neglect with regard to Kye.B., however, must be reversed. While there may be some debate about the appropriateness of spanking a three-year-old, there is no evidence that these spankings were abusive or unreasonable in nature. D.B. even testified that she specifically did not use a belt on Kye.B. because he was younger than the other two children, evidence indicating that physical abuse was not *imminent* when he was removed from her custody. There was no contrary evidence of unreasonable or immoderate physical force directed or threatened toward Kye.B., and no other proof that he—as opposed to his two siblings—was in imminent danger.

Regrettably, much time has passed since the trial court ruled in this case. On remand, the court will have to make a new ruling as to Kye.B. based on the facts and law as they exist at the time of the remand proceedings. We are confident that the court will give fair consideration to all relevant factors and will reach a decision which protects and promotes the best interests of Kye.B. *See In re C.T.,* 724 A.2d 590, 599–600 (D.C.1999) (entrusting remand proceedings to "the discretion and creativity of the trial court").

## V

In the cases involving the two oldest children, Kya.B. and K.B., the adjudications of neglect are affirmed. In the case of Kye.B., the youngest child, the judgment is reversed, and his case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*