**In re K.S., J.S., Appellant.**

**No. 04–FS–1597.**

District of Columbia Court of Appeals.

Argued Feb. 5, 2009.

Decided March 5, 2009.

Marion E. Baurley, for appellant.

Alice Stevens, Assistant Attorney General, with whom Peter J. Nickles, Interim Attorney General at the time the brief was written, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Catherine Ferrando, Assistant Attorney General, were on the brief for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and PRYOR, Senior Judge.

THOMPSON, Associate Judge:

After a four-day bench trial in the summer and fall of 2004, the Superior Court made a finding that K.S., then fifteen years old, was a neglected child. J.S., the mother of K.S., appeals the neglect finding and also challenges other rulings rendered by the trial court during the course of the neglect proceedings. For the reasons that follow, we affirm.

## I.

On April 16, 2004, the District of Columbia filed a petition in the Superior Court alleging that J.S. had hit, beaten and threatened K.S. on multiple occasions and had performed vaginal examinations on the child. After a probable cause hearing held on the same day, the magistrate judge (the Honorable Juliet J. McKenna) determined that K.S. could not safely remain in the family home and ordered her placed in shelter care subject to supervised visits with J.S. One week later, over J.S.'s opposition, Judge McKenna ordered K.S. into the care of her maternal aunt, C.S., where she remained throughout the neglect proceedings.[1]

On July 22, 2004, the District filed a written motion asking the court to permit K.S. to testify at the neglect hearing outside of J.S.'s physical presence, by closed circuit television, so that K.S. would not have to face her mother directly (but all trial participants would be able to observe K.S.'s demeanor and subject her to real-time questioning). Over J.S.'s objection, the trial judge, the Honorable J. Michael Ryan, granted the District's motion.

K.S.'s testimony at the neglect hearing focused on how her mother subjected her to "virginity tests" and physical punishment.[2] K.S. testified that, approximately four times during K.S.'s adolescent years, J.S. made K.S. undress, lie down on a bed, and spread her legs. On each occasion, J.S. conducted a visual inspection and touched K.S.'s vagina with her fingers, aiming to "check and see if ... [K.S.] was open and having sex." K.S. testified that these examinations made her angry and depressed, and left her "want[ing] to commit suicide," but she did not tell her mother to stop because she was "scared of her."[3] On one occasion in January 2003, after discovering a romantic e-mail that K.S. had sent to a boy, J.S. took K.S. to the doctor "to see if I was a virgin," even though K.S. had maintained that she had never had sex. Thereafter, K.S. testified, J.S. told her that the laboratory tests from that visit indicated that K.S. had gonor-

---

1. Prior to the hearing on this issue, J.S. had filed a motion asking the court to keep K.S. in foster care. She informed the court that she did not want K.S. to stay with maternal relatives because these relatives were too lenient with K.S. and because K.S. should not be rewarded for her efforts to escape her mother's strict rules. In her brief to this court, J.S. again contends that Magistrate Judge McKenna abused her discretion in placing K.S. with C.S. She argues that, because she had a fundamental right to make decisions regarding the care and control of her child, the court should have placed greater weight on her preferences in determining K.S.'s placement. We do not reach this issue because, without a record of the April 23, 2004 proceeding or any other record showing Judge McKenna's reasons for approving K.S.'s placement with C.S., we have no basis for review. Moreover, the record indicates that K.S. is nearly twenty-one years old and is living independently as she prepares to exit the foster care system, meaning that any dis-

pute over who should be her custodian is likely moot.

2. During direct examination, K.S. testified from a room at the Child Advocacy Center in the presence of counsel for the District and Judge Ryan, while J.S. and J.S.'s attorney observed via closed-circuit television and participated from a separate room. During cross-examination and redirect, K.S. gave her testimony in a jury room of the Superior Court, in the physical presence of Judge Ryan, counsel for the District, counsel for the father, and counsel for J.S. J.S. watched from the courtroom via closed-circuit television and, throughout K.S.'s testimony, was able to communicate electronically with her counsel.

3. K.S. clarified that, in describing these "virginity tests," she was not referring to two occasions on which her mother had applied medication (for a yeast infection) to K.S.'s genital area.

rhea. Insisting that she knew K.S. had been having sex, J.S. proceeded to beat K.S. with a belt on K.S.'s (clothed) buttocks. The beating lasted for "like an hour and something because she kept taking pauses forever." All the while, J.S. kept demanding to know the name of K.S.'s sexual partner. Eventually, K.S. falsely confessed to having had sex, so that her mother would relent.

K.S. also described other occasions on which her mother hit her. During the spring of 2004, J.S. hit K.S. with an open hand for failing to fold her clothes properly. Another time, because K.S. had not organized certain photographs neatly, J.S. used a belt to hit K.S. on her left wrist, which had recently been broken, and the wrist "swelled up real bad."

Several of K.S.'s relatives were also called as witnesses by the District. C.S., J.S.'s mother, testified that J.S. frequently hit or threatened to hit K.S.[4] and that J.S. was unduly "rough" with K.S. when the child was recovering from a broken leg. T.S., K.S.'s cousin, testified that J.S. used to "pop" and "beat" K.S. when K.S. was young, such as when J.S. "was telling [K.S.] to find some socks ... and she wouldn't find them fast enough."[5] S.S., another cousin, testified that she heard J.S. threaten to beat or whip K.S., that K.S. was "petrified" of J.S., and that she

(S.S.) had observed bruises on K.S.'s person on occasion.[6] To S.S., J.S. "seemed like she was just obsessed with protecting [K.S.] from having sex." A.S., a cousin with whom K.S. is especially close, testified about instances in which K.S. had complained of J.S. "always hitting on her with stuff" and of "how hard it was living with [J.S.]." K.S. had also told A.S. about J.S. examining K.S.'s private parts "just to see was [K.S.] having sex."[7] K.S. told A.S. that K.S. "felt like she wanted to kill herself." K.S. also told A.S. that J.S. "would always threaten to slap [K.S.] to the floor," that J.S. had threatened to murder K.S., and that on one occasion J.S. beat K.S. while praying aloud, "God, please don't let me murder her."

Licensed clinical psychologist Dr. C. David Missar testified as an expert for the District, on the basis of his interview of K.S. and his evaluation of her mental health and general emotional functioning.[8] Dr. Missar characterized the type of vaginal examinations that K.S. described—examinations for the purported purpose of determining whether K.S. was sexually active[9]—as "assaults" that can violate the child's "emotional sense of well-being" and that can have "tremendous negative emotional repercussions" for the child and lead the child to become "incredibly depressed

---

4. C.S. testified that J.S. "would tell [K.S.] to do stuff, and then she didn't give enough chance to do it, and if she didn't do it in a timely fashion she would hit her, she would slap her" across the face or upper back.

5. T.S. had not seen J.S. hit K.S. recently, and could not recall anything else that was "over the extreme."

6. S.S. also saw J.S. "pop [K.S.] a couple of times ... but it wasn't that serious."

7. A.S. testified that K.S. differentiated between these instances and occasions when J.S. applied medication to K.S.'s genital area.

8. Dr. Missar testified that 60 to 65 percent of his practice "involves doing evaluations primarily for the D.C. Superior Court in family cases [relating to] abuse, neglect, and custody." Judge Ryan accepted him as an expert in child and adolescent psychology.

9. Another expert witness, pediatrician Dr. Allison Jackson, testified that professionals in her field are not trained to detect whether adolescent girls are sexually active and explained that "virginity" is not a medical concept.

or anxious." Dr. Missar opined that K.S. had suffered just such negative effects as a result of the vaginal examinations to which J.S. subjected her. He opined that K.S. suffered from Post–Traumatic Stress Disorder ("PTSD"), which was the result of those examinations and other physical abuse, including "excessive physical discipline" by J.S.

J.S. testified that K.S. had fabricated allegations of abuse in order to escape the strict rules of the household. J.S. explained that she did not permit K.S. to have boyfriends or to go out without adult supervision, and that she used non-physical discipline to enforce her rules. J.S. told the court that when K.S. began staying with her aunt in April 2004, K.S. told J.S. that she did not want to return home because she enjoyed the freedom her more lenient relatives afforded her. J.S. further testified that she had examined K.S.'s genital area only for health-related reasons. First, in December 2002, J.S. conducted a "visual check" of K.S.'s vagina when K.S. came home "crying and screaming ... at the top of her lungs" and complaining of stomach pain and irritation in her genital area. J.S. wanted to determine whether K.S. was experiencing discharge, so that she could report such a symptom to the doctor, whom she had arranged for K.S. to see in January. After the doctor's appointment, J.S. received by mail the results of K.S.'s gynecological tests, which she understood to indicate that K.S. had both a yeast infection and gonorrhea.[10] J.S. obtained the prescribed medications and helped apply the medication to K.S.'s vagina. The following summer, J.S. again arranged for K.S. to see a gynecologist and, when K.S. again was diagnosed with a yeast infection, J.S. once more helped her

to apply medication internally. J.S. acknowledged that she punished K.S. (for, J.S. presumed, the child's having engaged in sexual activity) after telling the child that her laboratory results were positive for gonorrhea, but J.S. denied using physical discipline.

Judge Ryan made oral findings at the end of trial on November 30, 2004, and later issued written findings in an order dated January 10, 2005. Judge Ryan explained that he believed K.S.'s testimony over that of J.S. "in light of the demeanor, candor and consistency of the child's testimony, juxtaposed with the unconvincing general denials of the mother." He found that J.S. (1) "performed several visual and digital examination of [K.S.'s] genitalia in an apparent effort to determine whether [K.S.] was engaging in sexual relations"; (2) "falsely reported to [K.S.] that [K.S.] had contracted Gonorrhea, and proceeded to beat [K.S.] on her buttocks for approximately one hour"; and (3) "hit [K.S.] with an open hand" for K.S.'s failure to perform household chores correctly; and that (4) "[t]hese ... beatings, have been accompanied by threats from [J.S.] to kill [K.S.], including an instance while beating the child wherein [J.S.] prayed aloud that she would not kill [K.S.]." Judge Ryan concluded that J.S. was a neglected child within the meaning of D.C.Code §§ 16–2301(9)(A)(i) and (ii) (2001), "in that the vaginal penetrations and beatings of [K.S.] over time constitute abuse by [J.S.]" and "in that the vaginal penetrations, beatings, and threats of harm demonstrate that [K.S.] lacked proper care and control from her mother as necessary for [K.S.'s] mental, emotional, and physical health."

10. In fact, the laboratory results showed that K.S. had gardnerella, which is not a sexually transmitted infection.

.

## II.

J.S. challenges the ruling by which the trial court permitted K.S. to testify from outside the courtroom via closed-circuit television, rather than in J.S.'s presence.

In previous opinions, this court has not considered specifically whether a child's testimony in a neglect proceeding may be given via closed-circuit television. However, in *In re Jam. J.*, 825 A.2d 902, 917 (D.C.2003), we did set out several principles that guide our analysis here. The specific issue in *Jam J.*, a neglect proceeding in which the trial court admitted children's hearsay reports of physical mistreatment, was whether the court erred in refusing to let appellants (the mother and her boyfriend) call the children as witnesses for cross-examination. *See id.* at 911. In analyzing that issue, we recognized that a parent's fundamental rights are at stake in a neglect proceeding, *id.* at 913, 914–15, and that the parents' due process rights were "impaired substantially by their inability to confront the children—their accusers—in court through live cross-examination." *Id.* at 911. We also recognized that the trial court's fact finding may be "less informed and reliable than it would [be] if the court had seen and heard the children itself," *id.* at 911; that a court should not "too quickly assume" in child welfare proceedings that testifying will be harmful to the child, *id.;* and that the trial court has no statutory obligation to consider the child's preference regarding whether and how to testify in a neglect case. *Id.* at 912. At the same time, we recognized that the overriding objective and "paramount consideration in neglect proceedings" is the best interest of the child, *id.* at 915 (citation omitted), and that the trial judge retains the discretion to impose limitations attendant to taking a child's testimony to protect the child. *Id.* at 912, 916. We concluded that the trial judge must balance the probative value of the child's testimony against the risk of harm to the child. *Id.* at 917. Due process permits the trial court to impose "reasonable conditions and restrictions on the conduct and scope of a child's examination," *id.* at 916, but before imposing such restrictions, the court must have a "firm" evidentiary foundation for finding that harm to the child would ensue from testimony without such restrictions. *Id.* at 915.

We concluded in *Jam. J.* that the trial judge must make "three case-specific factual determinations" to justify the extreme measure of excluding a child's testimony. *Id.* at 917. First, "the trial court must make a finding on the record," supported by "concrete evidence individualized to the particular child," that testifying "would create a risk of serious harm to the child." *Id.* at 917. We observed that expert testimony "will often be the best evidence" to support such a finding, but contemplated that such testimony "may not always be required." *Id.* at 917. Second, "the court must consider whether the risk [of harm to the child] can be alleviated by means short of prohibiting the testimony altogether," *id.,* noting specifically that the trial judge might consider the alternative of "using closed circuit cameras to receive the child's testimony out of the physical presence of the parent accused of neglect." *Id.* Third, the court "must evaluate the probative value of the child's testimony and the parent's concomitant need for it." *Id.* at 918. Only if the potential damage to the child's best interests outweighs the parent's need for the child's testimony may the court exclude the testimony altogether. *See id.*

As we noted in *Jam. J., id.* at 917, the Supreme Court has held that in the criminal context, where the Sixth Amendment to the U.S. Constitution guarantees the

accused the right to confront witnesses against her, a court may permit a child witness to testify via one-way closed circuit television if the court concludes that doing so is necessary to protect the child from emotional trauma.[11] *See Maryland v. Craig,* 497 U.S. 836, 855, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *see also Hicks–Bey v. United States,* 649 A.2d 569, 575 (D.C.1994) (holding that trial judges in the District may employ the procedure approved in *Craig,* notwithstanding the absence of local enabling legislation). To justify such a conclusion, the court must: (1) hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant, and (3) find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis. See Craig, supra,* 497 U.S. at 856, 110 S.Ct. 3157 (explaining that "[i]f the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present"); *see also Jam J., supra,* 825 A.2d at 917 (the judge must make an individualized, evidence-based finding of "serious harm" to potential child witness). We have followed *Craig* in resolving issues relating not only to testimony by young children, but also to testimony by teenage witnesses. *See Ahmed v. United States,* 856 A.2d 560, 561 (D.C.2004) (applying *Craig* to permit a "teenage" girl to testify against her father via closed-circuit television, where expert opined that teenager's continuing to testify "would ultimately escalate [her] stress to trauma").

■ Application of the analysis that we laid out in *Jam. J.* will sometimes permit the complete exclusion of live testimony by a child witness whose hearsay statements are admitted as substantive evidence against the parent in a neglect proceeding. *Craig* permits the government to present a child's testimony via closed-circuit television in the context of a criminal prosecution, notwithstanding the rigorous demands of the Sixth Amendment. In light of these precedents, the restriction that Judge Ryan employed here—permitting K.S. to testify before the judge in the neglect proceeding while her mother J.S. watched and listened via closed-circuit television with an opportunity for cross-examination—easily falls within the range of restrictions that the trial court could impose in balancing the important competing interests at stake. Accordingly, the only real issue is whether the trial judge had a sufficiently firm evidentiary basis for the balance that he reached. We are satisfied that Judge Ryan's ruling was supported by a sufficient factual foundation.

Along with its motion to permit K.S. to testify via closed-circuit television, the District submitted to the court an evaluation prepared by Dr. Missar, who had interviewed and tested K.S. on June 30, 2004. Dr. Missar opined that "testifying in open

11. The Sixth Amendment Confrontation Clause does not apply in civil neglect proceedings. *See In re D.B.,* 947 A.2d 443, 449 n. 11 (D.C.2008). However, because a parent's entitlement to due process in a neglect case includes some right to confrontation or cross-examination, *see, e.g., id.* at 449, we have drawn upon Sixth Amendment jurisprudence in considering due process issues in neglect cases. *See Jam. J., supra,* 825 A.2d at 915 (noting that the District's neglect statute provides protections "similar to those made available for a criminal defendant").

court will be traumatic for [K.S.]. . . . [I]t would likely be much less traumatizing for her if she were able to testify outside the presence of her mother (in some way)." Thus, Judge Ryan was presented with, and he expressly relied on, expert evidence that an arrangement such as closed-circuit television was necessary to protect K.S.; that the adverse effect on K.S. of testifying in open court related not to the courtroom generally, but to the presence of J.S.; and that K.S. would suffer "trauma"—*i.e.,* more than de minimis harm—if she had to testify in her mother's presence.[12]

■ We recognize the force of J.S.'s argument that permitting K.S. to testify via closed-circuit television prevented K.S. from having to "look[ ] her mother in the face," a result that J.S. contends facilitated the child's making of false accusations. Our system of justice relies heavily on precisely such confrontation to deter lying and promote truth-telling. *See Coy v. Iowa,* 487 U.S. 1012, 1019, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (observing that a "witness may feel quite differently when he has to repeat his story while looking at

the man whom he will harm greatly by distorting or mistaking the facts") (citation and quotation omitted). However, this record—which includes testimony by both K.S. and her relatives to the effect that K.S. was "petrified" of her mother—provides us ample reason to think that being required to testify in her mother's presence may have made K.S. reluctant to give a complete and truthful account of her experiences with her mother. *See Jam J.,* 825 A.2d at 915 n. 8 (noting that there is evidence in the psychological literature that a child's live, in-court testimony before a guilty defendant "may promote inaccurate testimony"). Given that the core evidence of neglect in this case included testimony about the mother's fear-inducing threats to, and extreme physical discipline of, the child and about trauma the child suffered as a result, we must reject J.S.'s suggestion that she had a near-absolute right to be present in person for K.S.'s testimony at the neglect hearing. *Cf. Williams v. United States,* 859 A.2d 130, 136–37 (D.C.2004) (closed-circuit procedures warranted where child stopped re-

---

12. *Cf. In re C.W.D.,* 232 Ga.App. 200, 501 S.E.2d 232, 241 (1998) (child witnesses in TPR proceeding could testify via closed circuit technology where doctor "testified that the children were afraid of their mother and that their post traumatic stress syndrome could be worsened unless closed circuit television was used"); *Lomholt v. Burt,* 219 F.Supp.2d 977, 983–84 (N.D.Iowa 2002) (psychologist's recommendation that it would be "very traumatic" for child to testify in defendant's presence, based upon her observation that child became "very anxious" when talking about defendant, justified trial court's authorization of closed circuit procedures); *In re C.C. & H.P.,* No: COA05–1532, 2006 WL 1823079, *3 (N.C.Ct.App. July 5, 2006) (where trial court "found sufficient reasons for [child] to fear testifying in the presence of her mother," court did not err in excluding mother from courtroom during child's testimony, where mother's counsel was allowed to remain).

Relying on *State ex. rel. Juvenile Dep't of Tillamook County v. Beasley,* [314 Or. 444,] 840 P.2d 78 (Or.1992), a case which we cited as persuasive authority in *Jam J.,* J.S. argues that Judge Ryan's decision to permit K.S. to testify outside J.S.'s presence was improper because the District presented no evidence about the expected duration of any injury to K.S. from testifying in open court and no evidence about "whether the predicted psychological injury is greater than the reaction of an average child witness." However, *Jam J.* did not import wholesale the test laid out in *Beasley.* Moreover, the factors that the *Beasley* court enumerated were tests to be applied before a court may *exclude* a child's testimony. Here, Judge Ryan took the far less restrictive approach of permitting J.S. to testify outside J.S.'s presence, subject to cross-examination.

sponding to questioning, cried in witness room, and expressed fear of defendant); *Ahmed, supra,* 856 A.2d at 565 (child witness repeatedly expressed fear of testifying before father and ran away and slept outside for a night to avoid returning to court).

■ J.S. suggests that the trial court could not reasonably rely on Dr. Missar's opinion as to the likely impact on K.S. of testifying in open court because Dr. Missar utilized "self-reporting measures," to wit, K.S.'s own "one-sided" descriptions of her experiences and feelings. However, as an expert in adolescent psychology, Dr. Missar could premise his opinion on interviews and tests of the type upon which "experts in [his] profession reasonably rely." *In re Melton,* 597 A.2d 892, 901 (D.C.1991); *see also District of Columbia v. Anderson,* 597 A.2d 1295, 1300 (D.C.1991) ("The facts underlying an expert opinion do not have to be uncontroverted"). J.S. has provided us no reason to question Dr. Missar's reliance on the evaluation techniques and tests that he described using with K.S. (including the Behavioral Assessment System for Children), and case law indicates that other experts also use such measures in diagnosing PTSD and mental and emotional conditions in children. *See, e.g., State v. Scott,* 275 S.W.3d 395, 408 (Tenn.2009) (observing that "[m]edical professionals reasonably may be expected to rely on self-reported patient histories," that many diagnoses, including PTSD, "cannot be validated by objective testing or are so difficult to validate that routine clinical practice relies solely on self report," that "reliance upon self-reporting is certainly common and often sufficient to be deemed reliable," and that cross-examination can effectively address reliability concerns); *Blake B. v. Council Rock Sch. Dist.,* No. 06–1968, 2008 WL 4489793, at *8 (E.D.Pa. Oct.3, 2008) (approving school psychologist's use of the Behavioral Assessment System for Children in conjunction with other diagnostic tools).

### III.

■ The contention on which J.S. focused at oral argument is that there was not sufficient evidentiary support for the trial court's finding that K.S. was a neglected child within the meaning of D.C.Code §§ 16–2301(9)(A)(i) and 16–2301(9)(A)(ii). We disagree.[13]

D.C.Code § 16–2301(9)(A)(i) establishes that the term "neglected child" includes a "child who has been ... abused by his or her parent ... or whose parent ... has failed to. make reasonable efforts to prevent the infliction of abuse upon the child." D.C.Code § 16–2301(9)(A)(i) (2001). "Abuse" includes "infliction of physical or mental injury," and "mental injury," in turn, refers to "harm to a child's psychological or intellectual functioning, which may be exhibited by severe anxiety, depression, withdrawal or outwardly aggressive behavior." D.C.Code §§ 16–

---

13. "In a child neglect proceeding, the District has the burden of proving by a preponderance of the evidence that a child is neglected within the meaning of D.C.Code § 16–2301." *In re N.P.,* 882 A.2d 241, 247 (D.C.2005) (citation omitted). When reviewing a challenge to the sufficiency of evidence underlying a finding of neglect, "we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge to determine credibility, weigh the evidence, and draw reasonable inferences." *Id.* at 247–48 (internal punctuation omitted) (citing *In re S.G.,* 581 A.2d 771, 774 (D.C.1990)). "Deference is due to the court's determination of abuse or neglect and we will not second-guess the trial judge on a very difficult call." *In re A.H.,* 842 A.2d 674, 684 (D.C.2004) (internal quotation and citation omitted). Thus, we will "reverse a finding of neglect only if it is plainly wrong or without evidence to support it." *In re L.H.,* 925 A.2d 579, 581 (D.C.2007).

2301(23)(A)(i), –2301(31). The term "neglected child" also includes a child who "is without proper parental care . . . necessary for his or her physical, mental, or emotional health. . . ." D.C.Code § 16–2301(9)(A)(ii).

Judge Ryan found that K.S. was a neglected child because "the vaginal penetrations and beatings of [K.S.] over time constitute abuse by [J.S.]." [14] J.S. argues that there was not sufficient evidence of physical injury or lack of physical care to sustain a finding of neglect because there was no evidence that K.S. suffered any serious injury from the episodes of beating or hitting that government witnesses alleged. [15] She also contends that there was an insufficient basis for a finding of sexual abuse, since Judge Ryan specifically credited J.S.'s testimony that she loved K.S. and wanted the best for her, and found that J.S. did not act with "malice" in digitally penetrating K.S.'s vagina. [16] We need not address these arguments because, even assuming (without deciding) that J.S. is correct on these points, the record contains sufficient evidence of mental and emotional harm to the child to support a neglect finding. Judge Ryan stated expressly that he believed K.S.'s testimony, which was that J.S. beat her, threatened to kill her, prayed aloud that she would not kill her, and conducted "virginity exams" on her, and that this treatment by her mother left her "depressed" and "want[ing] to commit suicide." [17] Much of

**14.** The quoted statement appears in the trial court's written order, issued on January 10, 2005. When making his oral findings, Judge Ryan stated, "I find that based on the virginity exams which were performed by you [J.S.], digitally, and involved penetrations of the child, based on the beatings which were administered over time, that the Government has met the burden by a preponderance. . . ."

**15.** See In re L.H., supra note 15, 925 A.2d at 581 (abuse finding lacked sufficient support where "[n]o evidence was presented that, as a result of being slapped and thrown to the floor, [child] suffered more than transient pain or temporary marks on her forearm"); but see id. ("the legislature has expressly required injury greater than that before a parent exercising discipline may be found to have abused her child by a single act of corporal punishment") (emphasis added).

J.S. urges in addition that K.S.'s testimony that J.S. beat her for over an hour with a belt was inherently incredible because such a beating, if it took place, would inevitably have resulted in serious injury, of which there was no evidence. This argument overlooks the specifics of K.S.'s testimony: that her estimate of the duration of the beating was approximate ("like an hour and something"), that she was clothed, and that J.S. did not hit her continuously, but instead "kept taking pauses forever." We think it is far from certain that such a beating would have produced visible or lasting physical injury or injury that required medical treatment.

**16.** Judge Ryan concluded that the evidence showed that J.S. loved her daughter but subjected her to "misguided care that has gone so far out of proportion that it's abusive." Accordingly, J.S. contends, there was no basis for a finding that J.S. had an intent to "abuse, humiliate, harass, degrade, or arouse or gratify . . . sexual desire," the mens rea that is required for a finding of sexual abuse under D.C.Code § 16–2301(34)–(35). But cf. State v. Yaacov, No. 86674, 2006 WL 2902794, at *7 (Ohio Ct.App. Oct. 12, 2006) (upholding conviction for sexual abuse based, in part, upon evidence that defendant touched complainant to check whether she was a virgin); S.R.B.R. v. Harrison County. Dep't of Human Servs., 798 So.2d 437, 439 (Miss.2001) (upholding finding of sexual abuse in TPR proceeding based upon evidence that father "checked [daughter], examined her, to determine if she was a virgin").

**17.** There was contrary testimony: J.S.'s testimony that she had only examined K.S. for health-related reasons; testimony by Arnetta Guthrie, a friend of J.S., that she had never seen J.S. hit her child and believed that J.S. was a good mother; and testimony by William Spears, the principal of K.S.'s school, who recalled finding it strange that K.S. already had the telephone number for child

K.S.'s testimony was corroborated by the testimony of A.S. and K.S.'s other relatives. Dr. Missar testified that K.S. exhibited symptoms of depression and anxiety and developed PTSD as a result of the vaginal examinations and excessive physical discipline by her mother.[18] Together, this testimony afforded the trial judge an ample basis to find that J.S. inflicted mental and emotional injury upon K.S. and failed to care for her mental and emotional needs, rendering her a "neglected child" within the meaning of D.C.Code §§ 16–2301(9)(A)(i) and (ii). *Cf.* D.C.Code 16–2301(31) (defining "mental injury" as including severe anxiety or depression); *N.P., supra* note 16, 882 A.2d at 250 (upholding finding of neglect where psychologist testified that child suffered depression, suicidal ideation, and post-traumatic stress disorder as a result of father's violence towards her); *In re L.D.H.*, 776 A.2d 570, 575 (D.C.2001) (evidence that child witnessed father abuse and injure child's

mother was sufficient to establish "mental abuse").

J.S. argues that the court's findings are internally contradictory because the court both (1) found it "difficult ... to understand that the mother who has micromanaged her child's life to the extent that J.S. could make the mistake between gonorrhea and gardnerella" and (2) at the same time, believed K.S.'s account that her mother beat her after telling her that she had contracted gonorrhea. However, Judge Ryan heard testimony that J.S. seemed "obsessed" with deterring K.S. from having sex, as well as testimony that J.S. frequently beat K.S. for insignificant mistakes or at the slightest provocation. In light of that testimony, Judge Ryan could, without inconsistency, both believe that J.S. told K.S. that K.S. had gonorrhea as an explanation for beating her and disbelieve J.S.'s explanation that she misunderstood the laboratory report to show that K.S. had tested positive for gonorrhea.[19]

protective services when she first complained to him of her mother's abuse. But Judge Ryan found, with respect to the critical facts, that K.S. was believable and that J.S. was not. Although J.S. invites us to do so, we have no basis for second-guessing Judge Ryan's credibility determinations. Assessing witness credibility and weighing evidence are quintessential functions of the trial judge, who "had the opportunity to observe [witnesses'] demeanor and form a conclusion." *S.G., supra* note 15, 581 A.2d at 775.

18. J.S. emphasizes that Judge Ryan neither specifically credited nor expressly referred to Dr. Missar's testimony about mental injury to K.S. However, Judge Ryan's oral findings leave little doubt that he accepted Dr. Missar's opinion. First, Judge Ryan noted that Dr. Jackson's testimony "didn't bring a great deal to the case from my standpoint" (other than to confirm that "virginity is not a medical term of art"). By contrast, in describing Dr. Missar's expert testimony about "psychological symptoms of the child which he related directly to beatings by the mother, digital exams by the mother," Judge Ryan made no

such observation. In finding that J.S.'s conduct toward K.S. constituted abuse, Judge Ryan cited the same conduct (digital vaginal penetrations and beatings) that Dr. Missar highlighted as the basis for his conclusion that K.S. had been abused. Further, Judge Ryan's observation that "[t]here are boundaries between our children and us" that must not be violated closely tracked Dr. Missar's testimony that, in adolescents, there is a self-protective "psychological dynamic at work ... of this is mine and it's mine to keep to myself and to share with others as I choose to share it with others" and of "yours touches mine only when I give you permission to do so," and that a parent's "violation of [the adolescent's] own personal body" is a traumatic assault that can lead to depression and anxiety.

19. Appellant raises one final claim which merits only a brief mention. J.S. argues that the court improperly prevented her from recounting, during her testimony, K.S.'s explanation of why she wanted to stay with her aunt instead of return home in April 2004.

Wherefore, the judgment of the Superior Court is hereby affirmed.

*So ordered.*

While Judge Ryan initially sustained a hearsay objection to such testimony, he immediately entertained argument on the issue, and retracted his original ruling moments later. Thereafter, J.S.'s counsel returned to her line of inquiry, and the court permitted the question. We have been unable to identify (and J.S.'s brief does not identify) any question that J.S.'s counsel was prevented from posing or any testimony that she was prevented from eliciting because of the court's initial ruling on this hearsay issue.