mon law under an emotional distress theory, not because it happens to fall within the definition of sexual harassment in the DCHRA, but because the blatant and repeated instances of inappropriate conduct have risen to such a level that they may properly be regarded as extreme and outrageous. *See id.* at 985. Accordingly, although an emotional distress claim may be predicated on the same conduct as a DCHRA claim, it does not impose liability for "a harm that is not a cognizable injury under the common law." *Hays,* 844 F.Supp. at 1223.

To sum up, we hold that a common law negligent supervision claim cannot be predicated on a violation of the DCHRA. It necessarily follows that the trial court did not err in granting summary judgment for Acacia on Count III.

### IV

For the reasons stated in this opinion, the judgment is affirmed as to Counts I and III of the complaint and vacated as to Count II. The case is remanded to the trial court for further proceedings with respect to Count II of the complaint consistent with part II of this opinion.

*Affirmed in part, vacated in part, and remanded for further proceedings.*

**In re L.H. & A.H., K.H., Appellant.**

**Nos. 06–FS–84, 06–FS–156.**

District of Columbia Court of Appeals.

Argued May 8, 2007.
Decided June 7, 2007.
As Amended on Denial of Rehearing
June 22, 2007.

Lisa H. Orlow, for appellant.

Karen A. Weiss, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the briefs were filed, Todd S. Kim, Solicitor General for the District of Columbia, and Edward E. Schwab, Deputy Solicitor General, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and FARRELL and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

K.H., the mother of two minor daughters, L.H. and A.H., appeals from twin adjudications of neglect by the trial court based on findings that L.H. had been physically abused within the meaning of D.C.Code § 16–2301(9)(A)(i) (Supp.2006), and was without proper parental care or control, *id.* § 16–2301(9)(A)(ii); and that A.H. was in imminent danger of abuse within the meaning of § 16–2301(9)(A)(v).

Appellant contests the sufficiency of the evidence to support the neglect findings. We agree and reverse. The evidence does not support a finding that L.H. suffered "physical injury," § 16–2301(30), from the actions of her mother sufficient to establish "abuse" under the statute, *see* § 16–2301(23)(A)(i), or that L.H. was without proper parental care or control; and it likewise does not support a finding that A.H. was in imminent danger of being abused.

## I.

Both children were removed from the custody of K.H. following a March 14, 2005, altercation when K.H. slapped her daughter, L.H., and threw her to the floor.[1] The District thereafter filed neglect petitions with respect to each child, primarily on the grounds stated above. The petitions were heard at a trial on December 20, 2005. At the time, the daughter L.H. was age sixteen, and the daughter A.H. was age fourteen.

At trial only two witnesses testified, an investigative social worker, Stan Golden, employed by the District's Child and Family Services Agency (CFSA), and appellant K.H. Golden's testimony, as reflected later in findings made by the trial judge, was

---

1. At the time, the mother had sole custody of the two children, who apparently had different biological fathers. Neither father has been a party to the neglect proceedings or these appeals.

partly as follows: On March 15, 2005, he went to the mother's home in response to a call by police reporting an altercation that had occurred there the day before. Interviewing the mother and L.H., he learned that K.H. had discovered a website set up by L.H. on the home computer, which (in the judge's words) "included multiple pictures of [L.H.] scantily clad. [She] was pictured in clothing that revealed her torso, including below the pubic hairline. The website also included information about the [child's] alternative sexual preference, information about oral sex, methods of sexual arousal, [her] home address, and places [she] frequented." Angered by the discovery and by L.H.'s indifferent response, K.H. slapped her daughter in the face and threw her to the floor. L.H. thereafter left the house and called the police, who responded and arrested K.H. temporarily. When Golden interviewed L.H. the next day, he saw "discoloration on a certain part of her forearm, indicating some type of surface trauma to the skin." Although the child was taken to the hospital as a precaution, no records showing treatment for the bruise or discoloration on the forearm were presented at the hearing, and no other evidence about its nature or extent was introduced.

Based on this evidence, the trial judge found that L.H. had been abused by her mother on March 14, 2005, when K.H. "struck [her] in the face, and threw her to the floor." The judge relied on § 16–2301(23)(A)(i), which defines "abused" to include "infliction of physical ... injury upon a child," in concluding that K.H. had "injur[ed]" her daughter and thus abused her. On the record before us, that finding cannot stand.

This court "will reverse a finding of neglect only if it is 'plainly wrong or without evidence to support it.'" *In re Am.V.*, 833 A.2d 493, 497 (D.C.2003). To be sustained, however, a finding of neglect must embody a correct understanding of the relevant statutory terms. Here, the legislature has not left the concept of "physical injury" undefined. Rather, the statute defines physical injury which may support a finding of abuse, and in turn neglect under § 16–2301(9)(A)(i), as "bodily harm greater than transient pain or minor temporary marks." Section 16–2301(30). No evidence was presented that as a result of being slapped and thrown to the floor, L.H. suffered more than transient pain or minor temporary marks on her forearm.[2] The child did not testify at the hearing. Stan Golden, who interviewed her the day after the incident, saw "trauma," but when asked what this was, said that the child had "discoloration" on her forearm "indicating some type of surface trauma to the skin." The trial judge, in her written order, described this as "irritation and discoloration"; the District, in its brief, is content to call it "irritation." No evidence suggested that it went beyond minor temporary marks, and the legislature has expressly required injury greater than that before a parent exercising discipline may be found to have abused her child by a single act of corporal punishment.

The District points out that "throwing [a] child" is among the acts that the statute expressly removes from the reach of legitimate parental "discipline." Yet the legislature was careful to state that a parent must have "inflict[ed] *injury* to a child" by "throwing [her]" before an act of this kind may be deemed abuse, § 16–

---

2. K.H. argues that the evidence, primarily objected-to hearsay testimony on the point, does not establish even a causal connection between the fall to the floor and the mark on the child's arm, which the mother testified was a birthmark. We need not resolve that issue.

2301(23)(B)(i)(III) (emphasis added); and by defining physical injury as it does, the statute makes clear that not every such act (including even "striking a child with a closed fist") is "*per se* physical abuse" (Br. for District at 15). Thus, the first basis for the judge's neglect finding as to L.H. may not stand.

## II.

■ We are not done with considering the throwing incident, however, because the trial judge believed it to be part of a wider pattern of circumstances requiring an alternative finding that L.H. was neglected because she was "without proper parental care or control." Section 16–2301(9)(A)(ii). Specifically, the judge found the throwing incident to be part of the mother's "history of excessive reactions to stressful situations." The judge pointed to the fact that in 1998, while involved in an abusive relationship with the father of her then youngest child, K.H. had contemplated suicide and killing her children.[3] The judge further noted that, while undergoing brief hospitalization and mental health treatment in 1998 for depression and related illness—treatment she apparently had sought voluntarily—the mother confessed that "she was essentially overwhelmed with the prospect of parenting when one of her children began to misbehave." The judge perceived a link between these 1998 events and the March 2004 throwing incident: "One of the factors that caused [K.H.] to seek mental health treatment in 1998, *i.e.* her inability to control one or more of her children, has reoccurred in this most recent event involving [L.H.]." In other words, the judge saw the throwing as symptomatic of a

condition—essentially a mental health condition—that disabled the mother from reacting reasonably, *i.e.*, not "excessively," to "misbehav[ior]" that could be expected from normal teenage children. This condition effectively rendered L.H. without proper parental care or control.

Even mindful of our limited scope of review, however, and of a trial judge's prerogative to draw reasonable inferences from the record, there are serious flaws in this analysis. First, as indicated, the mother's precarious mental health in the late 1990's, and the risks it posed to her children at that time, influenced the judge's finding that K.H. could not be trusted to react reasonably to "stressful situations" (such as L.H.'s website misbehavior) at the present time and in the future. In effect, the judge found ongoing mental instability on K.H.'s part—the risk of her becoming "overwhelmed" by circumstances and overreacting, as in the throwing incident—that left the children without proper parental control. Yet the judge heard no psychiatric or other medical testimony relating the mother's past medical condition to her conduct in 2004 and her present capacity to parent. The District, it must be noted, did not allege that the children were neglected because K.H. was "unable to discharge ... her responsibilities to and for the child[ren] because of ... mental incapacity." Section 16–2301(9)(A)(iii). And there was documentary evidence that K.H. had been treated with medication and psychotherapy since the 1998–99 episodes, without further need for hospitalization. The judge nevertheless extrapolated from the earlier treatment for mental illness to an explanation for her behavior in punishing L.H. and a

---

**3.** This and other information the judge looked to regarding the mother's mental history and actions in 1998 and 1999 was contained in the records of previous neglect adjudications regarding L.H. and A.H. that, without objection, were made part of the evidence in this case.

conclusion generally that she would react "excessive[ly]" to stressful situations. Without medical testimony supporting that inference, it rests, in our view, on too much speculation to support a finding of neglect. *Cf. In re M.D.*, 758 A.2d 27, 32 (D.C.2000) (in circumstances presented, "[t]o prove that the care which [the mother] provided was inadequate and detrimental to M.D., expert medical testimony was required").

This is particularly so given what had provoked the March 14, 2005 altercation between mother and daughter. Investigator Golden, after a relatively brief interview with L.H., concluded that she was "amenable to direction," and thus that the mother's reaction to finding her daughter depicted semi-nude on the website "was excessive force . . . when a lower form of discipline could have been used." It does not minimize the seriousness of any act of a parent's throwing a child to the floor to say that Golden's assessment—accepted by the trial judge—takes inadequate account of the provocation K.H. experienced. Beyond the semi-nude pictures of the child, the website described (in Golden's words) "oral sex and ways to be aroused and [L.H.'s] . . . alternative sex preference"; and it listed her home address and "places [where L.H.] hangs out." It is hard to imagine a parent who would not be shocked and angered by that discovery, for the reason alone that, as K.H. explained, "someone [could] harm [the child] because they [would] know what she look[s] like if she goes outside," as well as knowing her home address. When confronted with the discovery, L.H. responded by saying, "like now you know, so what," which triggered the mother's angry and all-too-human reaction of striking her hard enough to make her fall. In a related context, we have recognized that anger is not necessarily

inconsistent "with the intent of disciplining [a] child," and that the law does not require "saintliness" of a parent in punishing a child for improper behavior. *Florence v. United States*, 906 A.2d 889, 895 (D.C. 2006) (in prosecution for cruelty to child, striking child with unheated curling iron did not lose character as legitimate discipline in view of the eleven-year-old child's prior "belligerence" toward mother). K.H.'s single action of slapping her daughter and throwing her to the floor, under the circumstances that provoked it, does not demonstrate an inability to act responsibly as a parent without additional evidence reflecting negatively on her fitness to raise the daughter.

That evidence is missing from this record. To the contrary, according to Golden, as a parent K.H. was "provid[ing] resources, was attentive, [and was doing] what was necessary to provide care and supervision to the children." As significant as these facts (as well as that "the physical environment of the mother's home was adequate") was the careful attention K.H. paid to L.H.'s education. As the judge acknowledged, the mother "met with [the child's] teachers, and worked to ensure that [L.H.] is involved in educational programs," with the result that L.H., an eleventh grader at Dunbar High School at the time, was "a straight 'A' honor student," despite instances of truancy. Further, mother and daughter had recently "discussed [with one another] job applications and internship applications submitted by [L.H.]." Altogether, this picture is simply not one of a child left without necessary care and supervision, and the single act of corporal punishment—even considering it to be excessive—on which the trial judge relied for that conclusion does not make it so.[4]

---

4. The judge adverted to the mother's "rambling" and "internal[ly] inconsisten[t]" testi-

mony in finding that she lacked "the mental and emotional ability to appreciate the . . .

The judge further relied on what she regarded as an "admi[ssion by K.H.] that she does not have the present ability to supervise [L.H.]." Neither the mother's testimony at trial nor her statements to investigator Golden, however, support that finding. K.H. admitted that in 1998 she had asked CFSA "to take custody" of her children, but explained that this was because of "domestic violence" she was experiencing at the time with her youngest child's father. More recently, because of "disciplinary problems" she had had with L.H. (these included, according to Golden, L.H. missing curfews and running away), the mother admitted having "called people to see if [L.H.] can at least be placed somewhere ... I told everybody I didn't know how to help her because [of] some of the stuff she was doing." But at trial K.H. insisted that she and L.H. were "over [this] situation" and "like, mov[ing] forward," pursuing group therapy together and seeing one another regularly. She disputed that she could not properly supervise L.H. if reunited with her. The fact that K.H. had earlier reached out to others for help with a difficult child cannot, in our view, be deemed an admission of "present [in]ability" to rear the child, otherwise the law would discourage precisely such efforts by a parent to seek the aid of others, including agencies such as CFSA charged with furnishing such support while striving to keep parents and children together.

Finally, the trial judge attached importance to what she considered to be K.H.'s "inability to appreciate [L.H.'s] deteriorating mental health condition." The judge had in mind very recent instances when the daughter, following removal from the mother's home and placement in a group home, had tried to harm herself by cutting her wrist. The judge found problematical the mother's unwillingness to acknowledge the child's evident "state of depression" reflected by these attempts.[5] Yet, no medical evidence was presented to the court about the causes—whether "depression" or something else—of the child's self-endangering behavior. Moreover, the mother explained her reaction to the girl's actions in a way suggesting the very opposite of an inability to appreciate their seriousness:

> [T]he first time she cut her wrist was when she went to Children['s] Hospital. I asked [her] a question, we [were] in a room by ourself ... [D]id you cut your wrist because you have so much in your mind it won't go away, and you cut your wrist so that you won't think about it and focus on the pain; she told me, yeah.
>
> And I said, you need to tell these people that, because they think you['re] depressed right now.... [T]hen, the second time she [had] done it, I asked her why ... and she said [that] that girl [doesn't] want to be with her no more.

---

excessive nature" of her striking of L.H. But "rambling" testimony by K.H., perhaps inartfully guided by her counsel, is a poor indicator of whether she understood the appropriateness of punishment administered, as we have seen, under considerable provocation and not reflecting any pattern of abuse or neglect of the child. Moreover, while K.H. betrayed some inconsistency in characterizing her daughter's behavior (variously admitting and denying that L.H. "present[ed] a disciplinary problem"), a parent of entirely normal "mental and emotional abilit[ies]" might be

similarly conflicted in describing a child who exhibits contradictory behavior during adolescence.

5. THE COURT: If [L.H.] is returned to your custody, how do you plan to address what some might ... consider[ ] as her state of depression?
[K.H.]: State of depression?
THE COURT: You think she's depressed?
[K.H.]: No.

I said, L., *you're going to meet so many other people, ... you can't make that [i.e., physical harm to yourself] your first and last resort ....* [Emphasis added.]

It is difficult to imagine a more comprehending, and empathetic, reaction by a parent to a child's attempts to do herself harm.

### III.

■ For the reasons stated, we hold that the trial judge's finding that the child L.H. was neglected cannot be sustained. It follows that the similar finding with respect to A.H. that she "is in imminent danger of being abused," and for that reason was neglected, likewise cannot stand. Other than the conclusions we have rejected—that L.H. had been physically abused and was without proper parental care and supervision—the trial judge stated no reason why the daughter A.H. was in immediate danger of abuse. The record reveals none. As "an individualized finding of imminent danger must be made for each child," *In re Kya.B.*, 857 A.2d 465, 473 (D.C.2004), and as no evidence would fairly support that finding in the case of A.H.,[6] the determination that she was neglected must also be set aside.

Accordingly, as to each of the two children, the adjudications of neglect are

*Reversed.*

---

6. Indeed, investigator Golden had concluded in March 2005 that A.H. "wasn't in imminent danger. And the child was allowed to remain in the home with the expectation that services would be put in place for the mother and the child."