$101,295.29. (Appellants' Exhibit and Transcript Reproduction 92.) She also testified that that was the amount of money owing on the water and sewer bill when it was sold to Breen in 1998. (*Id.* at 98.) The computer "does the calculations" and that number would reflect the amounts paid on the bill. (Appellants' Exhibit and Transcript Reproduction 104; Appellees' Exhibit and Transcript Reproduction 114.)

Exhibit 3 reflects fifteen payments ending in 1996, before the lien was sold. (It just does not make clear how these payments were applied.) I think it is fair to infer that those payments were applied to the oldest balances first, and that the running balance shows the amount due after payments were credited.

Michelle Tisot, a representative of Breen, testified that Breen purchased a lien in the amount of $101,295.29. (Appellees' Exhibit and Transcript Reproduction 115.) She also identified Exhibit 5, a computer record from Breen showing that principal amount. (Appellants' Exhibit and Transcript Reproduction 89.) She had added the principal and interest as of August 29, 2001, to reach the sum of $140,435.65. (Appellees' Exhibit and Transcript Reproduction 116.) Mr. McQuade, an expert witness for Waterfall, testified that the accumulated balance on a corpus of $140,435.65, computed at the rate of one percent per month compounded, as of May 13, 2004, was $193,168.05. (Appellees' Exhibit and Transcript Reproduction 117–18.)

I agree that Ms. Schooler's testimony about her adding machine tape (Exhibit 4) is confusing. She said at one point that the tape "only gave you the bills that were rendered. It didn't include any kind of payments that were made." (Appellants' Exhibit and Transcript Reproduction 101.) At another point, however, she stated that the tape reflected "what's due. It is the balance that's due on the account." (*Id.* at 103.) Even if we find this testimony less than pellucid, it described the adding machine tape—an alternative method for calculating the amount of the lien sold to Breen. It does not undermine the evidence about the computer-generated balances described above. Those computer balances and the associated testimony support Judge Dixon's findings.

\* \* \* \* \* \*

For the foregoing reasons, the judgment is affirmed.

*Affirmed.*

**In re A.B., N.D., and Ma.F.**

**N.B., Appellant.**

**Nos. 06–FS–1010, 06–FS–1011, 06–FS–1012.**

District of Columbia Court of Appeals.

Argued May 21, 2009.

Decided July 1, 2010.

Laurie P. McManus for appellant.

John Woykovsky, Assistant Attorney General, Office of the Solicitor General, with whom Peter J. Nickles, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Catherine Ferrando, Assistant Attorney General, Office of the Solicitor General, were on the brief, for appellee District of Columbia.

Before RUIZ, GLICKMAN, and THOMPSON, Associate Judges.

GLICKMAN, Associate Judge:

Appellant N.B. asks us to reverse the adjudication of her three young daughters

as neglected children within the meaning of D.C.Code § 16–2301(9) (2001 & 2009 Supp.). The trial court found that three-month-old Ma.F. had suffered physical abuse, which her parents, N.B. and M.F., had failed to make reasonable efforts to prevent; that five-year-old A.B. and seven-year-old N.D., who lived in the same household as Ma.F., were in imminent danger of being physically abused themselves; and that all three children were without proper parental care or control. N.B.'s challenge to these findings raises two principal questions.[1]

The first is whether the trial court erred in allowing Dr. Allison Jackson, a pediatrician and expert on child abuse, to render the opinion that Ma.F.'s multiple fractures were caused by blunt force trauma rather than a genetic bone disorder known as osteogenesis imperfecta, where Dr. Jackson based her opinion, in part, on the findings of a colleague in a medical specialty (pediatric genetics) outside her own area of expertise. We conclude the court properly admitted Dr. Jackson's testimony under the general rule that an expert witness is permitted to rely on the opinion of another expert in formulating her own opinion when such reliance is reasonable in the expert's particular field. Although the rule is not a license for one expert merely to parrot the conclusion of another, that is not what occurred in this case.

The second question is whether there was sufficient evidence for the trial court to conclude that A.B. and N.D. were neglected children. The court so found in consideration of the pattern of physical abuse inflicted on their infant sibling, Ma. F., with whom they resided; A.B.'s report that her mother and Ma.F.'s father had hit her with a ruler and a belt; and the ad-

verse inference the court drew upon finding that Ma.F.'s father testified falsely at trial when he denied having corporally punished the girls. We conclude that the evidence before the court was insufficient to support the adjudications of neglect as to A.B. and N.D., in essence because it did not show that the children had been, or were in imminent danger of being, abused within the meaning of the neglect statute.

## I. Background

Ma.F. was three months old when her parents, N.B. and M.F., brought her to Children's National Medical Center ("Children's Hospital") in the middle of the night because she was in discomfort, her feet were swollen, and the skin on her feet was peeling. X-rays of the feet revealed fractures of her left first metatarsal (the "big toe") and the ends of her tibias near her ankles. The tibia fractures were of the "corner" or "bucket handle" type, where a sliver of the bone shears off from the main shaft—or, to put it another way, the plane of the fracture is closer to being parallel to the length of the bone than it is to being transverse. A follow-up full skeletal survey, which x-rayed all the bones in Ma.F.'s body from multiple views, disclosed a number of additional fractures in her arms and legs, including corner fractures of her left and right tibias and her left femur near the knee, a corner fracture of her right humerus near the elbow, two fractures of her left radius (one near the wrist and the other near the elbow), and a fracture of her left ulna. The fractures were in various stages of healing, implying they had been sustained at different times.

Ma.F. was treated at Children's Hospital by emergency room staff and by the orthopedic surgeon on call. In light of the

---

1. Ma.F.'s father, M.F., has not challenged the neglect adjudications on appeal. S.D., the biological father of A.B. and N.D., did not participate in the proceedings below and is not a party to this appeal.

troubling x-ray results, Ma.F. also was evaluated by Dr. Allison Jackson, the Medical Director of the Child and Adolescent Protection Center at the hospital. Dr. Jackson concluded that Ma.F.'s injuries were likely caused by inflicted blunt force trauma, and she filed a report of suspected abuse with the D.C. Child and Family Services Agency (CFSA). In addition, she recommended that a pediatric geneticist be consulted. The purpose of this consultation was to rule out the alternative diagnostic possibility—one the radiologist rejected and Dr. Jackson considered unlikely, based on Ma.F.'s x-rays and other clinical evidence—that the fractures could be attributed to osteogenesis imperfecta, a congenital disorder causing weak and brittle bones. The geneticist subsequently reported that the DNA test results for that disorder were negative, confirming Dr. Jackson's and the radiologist's judgment. Over the objections of Ma.F.'s parents, Dr. Jackson testified to her diagnostic conclusions in the trial proceedings below.[2]

N.B. and M.F. met with a social worker from CFSA's Child Protection Services Unit the day after Dr. Jackson filed her report. Neither parent was able to account for Ma.F.'s injuries (an inability that continued through the ensuing proceedings in Superior Court[3]). Perceiving that Ma.F. and her sisters, A.B. and N.D., would all be at continuing risk of physical abuse if they remained in N.B. and M.F.'s custody, the CFSA social worker had the three girls removed and placed in shelter care.[4] The District filed neglect petitions as to each girl.[5] A.B. and N.D. thereafter were examined by a pediatrician, Dr. Betina Franceschini, and A.B. was evaluated by a psychologist, Dr. Jennifer Carter. Along with Dr. Jackson, Dr. Franceschini and Dr. Carter would provide critical testimony when the neglect petitions came on for trial.[6]

## II. Dr. Jackson's Testimony Regarding Ma.F.'s Injuries

N.B. frames her challenge to the admission of Dr. Jackson's opinion testimony regarding the cause of Ma.F.'s injuries as an attack on the doctor's qualifications. To be qualified as an expert, a witness must have "sufficient skill, knowledge, or experience" in the relevant area that her opinion testimony will "probably aid" the trier of fact to arrive at the truth.[7] The determination that a proposed expert has the necessary qualifications is committed to the trial court's sound discretion.[8] In

---

2. The radiologist and the geneticist were not called to testify at trial. The orthopedic surgeon, who did testify, described Ma.F.'s injuries but expressed no opinion as to their cause or whether Ma.F. had a bone disorder.

3. The trial court made no finding as to who had injured Ma.F., concluding only that her parents had failed to make reasonable efforts to prevent the infliction of abuse upon the child. *See* D.C.Code § 16–2301(9)(A)(i).

4. *See* D.C.Code §§ 16–2309(a)(3), 16–2310(b) (2009 Supp.).

5. *See* D.C.Code § 16–2312(a)(1) (2009 Supp.).

6. N.D. was evaluated by a different psychologist, who was not called to testify at the neglect trial.

7. *Dyas v. United States,* 376 A.2d 827, 832 (D.C.1977) (internal quotation marks and citation omitted); *accord, e.g., Jones v. United States,* 990 A.2d 970, 979 (D.C.2010); *Burgess v. United States,* 953 A.2d 1055, 1062 (D.C. 2008). N.B. does not dispute that the other criteria set forth in *Dyas* for the admission of expert testimony—that the subject matter be beyond the ken of the average layperson, and that the state of knowledge in the relevant field permits a reasonable opinion to be advanced—were met here.

8. *See In re Melton,* 597 A.2d 892, 897 (D.C. 1991) (en banc).

the present case, the court qualified Dr. Jackson as an expert not only in the area of pediatrics generally, but also in the field of child abuse and neglect specifically. There is no serious dispute about the soundness of *that* ruling. Dr. Jackson was a board-certified pediatrician with extensive training and experience in the diagnosis, care, and treatment of abused children. At Children's Hospital, she served as medical director of the department charged with evaluating and treating children suspected of having been maltreated. She had taught medical students and other professionals about child abuse and neglect, and she was a member of the child abuse and neglect section of the American Academy of Pediatrics and of specialty organizations such as the American Professional Society on Abused Children. Dr. Jackson had evaluated hundreds of children for physical abuse—a large percentage of whom, like Ma.F., presented with bone fractures.

N.B. contends, however, that Dr. Jackson was unqualified to interpret Ma.F.'s blood test results and exclude the genetic disorder osteogenesis imperfecta ("O.I.") as the cause of her bone fractures. Only a geneticist, N.B. argues, would have been qualified to render such an expert judgment. Dr. Jackson admittedly was not a specialist in genetics or in the treatment of the congenital bone disorder. N.B. asserts that Dr. Jackson impermissibly parroted the geneticist's conclusion in rendering her own medical opinion that Ma.F.'s fractures were caused by blunt force trauma and not O.I.

We disagree. N.B. understates Dr. Jackson's expertise and overstates the extent to which Dr. Jackson relied on the geneticist's finding. Dr. Jackson testified without contradiction that she was capable of recognizing osteogenesis imperfecta herself by virtue of her pediatric training and her experience. Indeed, she testified that any pediatrician would have been able to do so. Dr. Jackson had cared for other patients with the disorder and had diagnosed O.I. or offered it as a differential diagnosis in other cases in which the condition later was confirmed. She was familiar with the clinical signs of O.I., which include abnormal bone mineralization and fragility, misshapen bones and abnormal healing of older fractures, so-called "wormian" bones in the skull (small plates in between the cranial bones), and a bluish tinge to the whites of the eyes. When Dr. Jackson examined Ma.F. and reviewed her x-rays and laboratory test results at Children's Hospital, she observed none of those signs. Dr. Jackson agreed that a particularly mild form of O.I. might not manifest such obvious symptoms, but, as she explained in her testimony, the sheer number of fractures Ma.F. had sustained made the theoretical possibility of mild O.I. implausible. The fact that Ma.F.'s fractures healed and no new fractures occurred in the two-month period following her placement in shelter care [9] was further evidence that the fractures were not due to a congenital bone disorder. Rather, Dr. Jackson explained, the fractures were of a particular type known to be caused by pulling, twisting, or tugging of an infant's extremities. (Other possible explanations, such as a traumatic childbirth, were ruled out for various reasons we need not go into here.) Consequently, though Dr. Jackson included O.I. as a differential diagnosis and requested a genetic consultation to exclude it definitively (in part because she had been unable to obtain a family history from the

---

9. This information was provided at trial by the orthopedic surgeon, who had examined Ma.F. both at Children's Hospital and after she had been placed in foster care.

parents), she considered it unlikely.[10] And while she cited the negative blood test and geneticist's report in support of her opinion, she testified that they were not "significant" or "important" factors in her diagnosis.

We are satisfied that neither Dr. Jackson's lack of specialization in genetics (or in bone disorders) nor her partial reliance on another expert's finding was disqualifying. A physician offering expert testimony need not be "a specialist in the particular field of which [s]he speaks,"[11] provided she is qualified to speak to the particular question at issue.[12] Dr. Jackson was qualified by her training and experience to diagnose O.I. or its absence based on her clinical examination of the patient and her review of the x-rays and hospital lab tests. Her lack of expertise in the causes and treatment of the disorder and the reliability of the blood test for the condition did not render her incompetent to give her diagnosis.

As to Dr. Jackson's partial reliance on a colleague's expertise, "[m]edical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions."[13] This court has adopted Federal Rule of Evidence 703,[14] which permits an expert witness to base her opinion on information that is otherwise inadmissible in evidence, including the out-of-court opinion of another expert, so long as that information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[15] The Rule was "designed to broaden the basis for expert opinions . . . and to bring the judicial practice into line with the practice of the experts themselves when not in court."[16] The drafters of Rule 703 expressly contemplated that it would permit a physician expert to rely on "reports and opinions from nurses, technicians and other doctors" in formulating her opinion.[17]

10. According to Dr. Jackson, the pediatric geneticist did meet with Ma.F.'s parents. While it is not clear what information the geneticist obtained from them, there is no suggestion in the record that Ma.F. has a family history of O.I.

11. *Melton,* 597 A.2d at 897 (quoting *Baerman v. Reisinger,* 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966)).

12. *See, e.g., Ferrell v. Rosenbaum,* 691 A.2d 641, 648–49 (D.C.1997) ("'[I]t is not necessary that an expert witness . . . be knowledgeable about the standard of care applicable to a particular medical specialty. Instead, the issue is whether the expert is qualified concerning the particular procedure about which he is testifying."); *Jenkins v. United States,* 113 U.S.App.D.C. 300, 307–08, 307 F.2d 637, 644–45 (1962) (explaining that a clinical psychologist may be qualified to diagnose a mental illness even though she has no medical training and therefore is unqualified to treat it); *accord, Ibn–Tamas v. United States,* 407 A.2d 626, 637 (D.C.1979).

13. *Walker v. Soo Line R.R.,* 208 F.3d 581, 588 (7th Cir.2000) (holding that trial court erred

in excluding the conclusion of a medical team leader that plaintiff suffered from post-traumatic stress disorder, even though the team leader was not a specialist in psychiatry and relied on the work of a team member, and stating, "we [do not] believe that the leader of a clinical medical team must be qualified in every individual discipline encompassed by the team in order to testify as to the team's conclusions"). "With the increased division of labor in modern medicine, the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them." *Id.* (quoting *Birdsell v. United States,* 346 F.2d 775, 779–80 (5th Cir.1965)).

14. *Melton,* 597 A.2d at 901.

15. *See id.* at 901–904.

16. Fed.R.Evid. 703 advisory committee's note to 1972 Proposed Rules.

17. *Id.* This long has been the rule in this jurisdiction. *See, e.g., Jenkins,* 113 U.S.App. D.C. at 304–05, 307 F.2d at 641–42 (holding

This is so even if those reports and opinions concern matters outside the testifying physician's realm of expertise. "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well." [18]

■■■■ To be sure, "[a] scientist, however well credentialed he may be, is not permitted to be the [mere] mouthpiece of a scientist in a different specialty." [19] Where there exists a serious question about "the soundness of the underlying expert judgment" that the testifying expert is unequipped to address, the author of that judgment must be called to testify in support of it; otherwise, if the testifying expert lacks "an adequate foundation" for her opinion apart from the judgment of the other expert, the testifying expert's opinion must be struck.[20] Likewise, if it is shown that the underlying expert judgment is "so lacking in probative force and reliability that no reasonable expert" could rely on it, an opinion that rests "entirely" upon such a flawed foundation should be excluded.[21] "In most cases," however, "objections to the reliability of out-of-court

material relied upon by [an expert witness] will be treated as affecting only the weight, and not the admissibility, of the evidence." [22] "[A] properly qualified expert is assumed to have the necessary skill to evaluate any second-hand information and to give it only such probative force as the circumstances warrant. Accordingly, the court should accord an expert wide latitude in choosing the sources on which to base his or her opinion.... [T]he judge may not substitute his or her judgment for the expert's as to what data are sufficiently reliable, provided that such reliance falls within the broad bounds of reasonableness." [23] The opponent remains free to impeach the basis of the testifying expert's opinion through cross-examination and the presentation of a counter-expert.

In this case, there is no evidence suggesting that it was unreasonable for Dr. Jackson to rely on the geneticist's report of Ma.F.'s blood test result. It was precisely the kind of routine medical consultation that physicians normally request and rely on, and there is no reason to think the consultation was performed inappropriately in this instance. All the evidence corroborated the geneticist's report; there is no evidence Ma.F. actually had O.I. or any other bone disorder. And, in rendering her opinion, Dr. Jackson did not "parrot"

that trial court erred in excluding psychiatrist's testimony that he changed his diagnosis based on his consideration of later psychological reports).

18. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir.2002) (emphasis removed).

19. *Id.* at 613–14. "Such reliance would amount to offering an opinion of another in violation of the hearsay rule." *Jenkins*, 113 U.S.App.D.C. at 305 n. 9, 307 F.2d at 642 n. 9.

20. *Dura Auto.*, 285 F.3d at 612–13.

21. *Melton*, 597 A.2d at 903 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y.1985)).

22. *Id.* at 903–04. In criminal cases, the Confrontation Clause of the Sixth Amendment may limit a prosecution expert's reliance at trial on testimonial hearsay, including the out-of-court opinion of a non-testifying expert. *See Veney v. United States*, 936 A.2d 809 (D.C. 2007) (reserving the issue for future consideration). This is not a criminal case, however, and no comparable limitation applies here.

23. *Melton*, 597 A.2d at 903 (internal citations omitted).

the geneticist's conclusion; she had her own independently sufficient reasons for her diagnosis. Although she also cited the blood test, her opinion did not rest on it. In short, Dr. Jackson was not a mere "mouthpiece" for an expert in another specialty, and the trial court did not abuse its discretion in permitting her to testify regarding her diagnosis of Ma.F.'s injuries without requiring the government to call the geneticist.[24]

Accordingly, we affirm the trial court's judgment that Ma.F. was a neglected child.

## III. The Sufficiency of the Evidence that A.B. and N.D. Were Neglected Children

N.B.'s second challenge is to the legal sufficiency of the evidence to support the neglect adjudications of five-year-old A.B. and seven-year-old N.D.[25] Our review of such a challenge is deferential: "[t]his court will reverse a finding of neglect only if it is plainly wrong or without evidence to support it,"[26] and only after viewing the evidence in the light most favorable to the court's ruling.[27] Nonetheless, we are compelled to agree with N.B. that the government did not present evidence sufficient to prove that her two older children were neglected.

Neither A.B. nor N.D. testified at trial, and the government introduced no direct evidence or expert witness testimony that either girl ever had been abused, injured, or otherwise neglected by (or through the fault of) their parents. The physical examinations performed on the girls at CFSA's request by Dr. Franceschini, a pediatrician, were, at best, inconclusive. A.B. had no observable injuries or any other physical sign that she had been mistreated. On the older girl, Dr. Franceschini observed "a one-centimeter, old, healing scar" on her right arm and a more recent two-centimeter "red linear abrasion" on her forehead. N.D. denied ever having been hit by an adult and told the pediatrician that the abrasion on her forehead had happened "on the playground a long time ago"—an explanation Dr. Franceschini deemed plausible. Dr. Franceschini found no reason to conclude that N.D. had been abused or neglected.

The sole evidence that either girl ever had been maltreated was provided in the

---

**24.** N.B. herself could have called the geneticist to testify, of course.

**25.** N.B.'s challenge to those adjudications is not moot (as the government contends) merely because all the children already have been returned to her and their cases have been closed, if only because the neglect findings still "might indirectly affect the appellant's status in potential future proceedings" relating to each child. *In re E.R.*, 649 A.2d 10, 12 (D.C.1994) (quoting *In re H. Children*, 156 A.D.2d 520, 548 N.Y.S.2d 586, 587 (N.Y.App. Div.1989)). This is particularly true inasmuch as the biological father of A.B. and N.D. (see footnote 1, *supra* ) could cite their neglect adjudications as a reason to alter their custody. *See* D.C.Code § 16–914 (2001). Our affirmance of Ma.F.'s neglect adjudication does not alter that conclusion; nor does it mean that any additional injury to N.B.'s reputation flowing from the neglect findings with respect to her other children is too negligible to support her standing to contest them. In *In re G.H.*, 797 A.2d 679, 683, 685–86 (D.C.2002), for example, where the appellant's standing to appeal findings of neglect with respect to three children was based solely on his reputational interest, and we affirmed the neglect adjudication of one child, we nonetheless went on to declare the evidence insufficient to support the neglect adjudications of the other two children.

**26.** *In re L.H.*, 925 A.2d 579, 581 (D.C.2007) (internal quotation marks omitted); *see also* D.C.Code § 17–305(a) (2001); *In re S.G.*, 581 A.2d 771, 774 (D.C.1990).

**27.** *E.g., In re E.H.*, 718 A.2d 162, 168–69 (D.C.1998).

brief reports of what A.B. had said to Dr. Franceschini and to Dr. Carter, the psychologist who evaluated her.[28] When Dr. Franceschini asked A.B. whether she ever had been hit by an adult, A.B. responded that her mother (appellant N.B.) "sometimes hit her with a ruler or a belt." Dr. Franceschini learned nothing further from A.B. on that score. Dr. Carter testified that she too questioned A.B. about her parents' disciplinary practices. Regarding her mother, A.B. "was very quiet and non-responsive." When Dr. Carter asked about her father, though, A.B. stated, "[D]addy whips me with a belt when I do something wrong." Dr. Carter also described an exercise in which she had A.B. finish incomplete sentences with the first thing that came to her mind. To a sentence beginning with the words "I wish my dad," A.B. added the words "would not hit." Dr. Carter confirmed that A.B. was referring to M.F. (and not to her biological father, S.D.). In reporting A.B.'s statements, Dr. Carter expressed no opinion as to whether they were true, or whether the child had been mistreated.[29]

N.B. did not testify at trial. M.F., who did take the witness stand, acknowledged having disciplined A.B. and N.D. when they misbehaved, but claimed he did so only by depriving them of things they wanted, or by sending them to their rooms.

Crediting A.B.'s statements to Dr. Franceschini and Dr. Carter, the court found that N.B. and M.F. had subjected each of the older girls to "excessive corporal punishment" by hitting them with a belt and (in the mother's case) a ruler. The court found that M.F. had lied on the witness stand when he denied using corporal punishment, and it inferred from his "false exculpatory statements a consciousness of guilt, from which guilt itself could be inferred." [30]

The court found that A.B. and N.D. were neglected children under two statutory criteria: they were "without proper parental care and control," [31] and they were "in imminent danger of abuse and another child living in the same household ... ha[d] been abused." [32] The rationale for each of those determinations was identical: considering the "pattern" of abuse inflicted on Ma.F.[33] in conjunction with the history of parental use of excessive corporal punishment in disciplining the older girls, the court concluded that A.B. and N.D. were

---

**28.** The trial court admitted A.B.'s out-of-court statements to Dr. Franceschini and Dr. Carter (over objection in the latter case) under the hearsay exception for statements made for purposes of medical diagnosis or treatment. *See In re Kya. B.,* 857 A.2d 465, 472 (D.C. 2004). That ruling is not challenged on appeal.

**29.** Dr. Carter was not asked about her psychological evaluation of A.B., and her evaluation report (on which she relied to refresh her recollection at trial) was not introduced in evidence. It is, however, in the court file and the record before us. Lest there be any question, we note that the report described A.B. as an apparently "well functioning child" who presented with no "acute mental health problems."

**30.** *See In re G.H.,* 797 A.2d 679, 684 (D.C. 2002) ("Credibility determinations were for the judge, as the trier of fact.... Moreover, the judge could reasonably infer consciousness of guilt, and therefore guilt itself, from [the witness's] apparently false exculpatory statements.").

**31.** D.C.Code § 16–2301(9)(A)(ii).

**32.** D.C.Code § 16–2301(9)(A)(v).

**33.** From the fact that Ma.F.'s numerous fractures evidently were inflicted over an extended period of time rather than in a single "isolated or impulsive incident," the court inferred that she had been the victim of "a consistent pattern of conduct posing a continuing risk."

at risk of future physical abuse themselves.[34]

In our view, the court's rationale was flawed. The finding that Ma.F. had endured a pattern of physical abuse for which her parents bore responsibility was supported by the evidence. By itself, however, that finding was not enough to support findings of neglect with respect to the older girls. "[T]here is no *per se* rule allowing a child to be adjudicated neglected ... simply because a different child in the same home has been abused.... A finding of imminent danger [of being abused] does not necessarily follow from the fact that a sibling has been abused."[35] Proof that parents have mistreated an infant does not demonstrate that the older children in the same household are similarly endangered. "[A]n individualized finding of imminent danger must be made for each child."[36]

Of course, the trial court here relied on its additional finding that, by hitting them with a belt and a ruler, the parents had employed excessive corporal punishment in disciplining A.B. and N.D. It is difficult to sustain this finding as to N.D. She did not complain of such mistreatment,[37] and A.B. did not say her parents had hit her older sister. While the court was entitled to draw an adverse inference from the falsity of M.F.'s testimony, we doubt that inference was sufficient by itself to support a finding that M.F. had employed excessive corporal punishment against N.D. The only evidence contradicting M.F.'s testimony about discipline came from A.B.'s statements.

■ Although it is a close question, we do think the court fairly could find by the requisite preponderance of the evidence that M.F. (if not also the children's mother) had used excessive corporal punishment in disciplining A.B.[38] Corporal pun-

---

**34.** There was no claim, nor any evidence, that A.B. or N.D. had suffered abuse (as that term is used in the neglect statute, which we discuss below) in the past, nor did the court so find. Rather, the court explained, "[b]ased on [Ma.F.'s] type and number of fractures, the consistent pattern of [Ma.F.'s] maltreatment, [M.F.'s] false exculpatory statements, and the continued presence of [A.B.] and [N.D.] in the home, concerns of imminent danger are well founded." And "[t]he unexplained fractures sustained by [Ma.F.] as a result of physical abuse combined with the excessive corporal punishment exerted on [N.D.] and [A.B.], establish the lack of proper parent care and control." The court cited no other basis for finding a lack of proper parental care and control.

**35.** *In re Kya. B.*, 857 A.2d 465, 472–73 (D.C. 2004) (citing *In re Te. L.*, 844 A.2d 333, 343–44 (D.C.2004)).

**36.** *Id.* at 473.

**37.** The record on appeal contains a psychological evaluation of N.D. performed by a Dr. Michael Gilliard. Dr. Gilliard did not testify, his evaluation report was not introduced in evidence at trial, and the trial court did not purport to rely on the report in finding that N.D. was a neglected child. Out of an abundance of caution, however, we have examined the report ourselves. As described in the report, N.D.'s statements to Dr. Gilliard on the subject of parental discipline do not establish that either parent used excessive corporal punishment in disciplining her:

> [N.D.] indicated that as an infant, her mother would pop her on the hand as a form of discipline. She subsequently reported that over time, her mother primarily used punishment and corporal punishment as forms of discipline. [N.D.] denied having ever felt as if she were abused....
> According to [N.D.], her father's primary form of discipline was corporal punishment. She asserted that her father's corporal punishment was not "hard." She denied having ever felt as if she were abused by her father.

**38.** The government's burden is to prove neglect by a preponderance of the evidence. *In re E.H.*, 718 A.2d 162, 168 (D.C.1998).

ishment is excessive when it goes beyond discipline "reasonable in manner and moderate in degree and otherwise does not constitute cruelty."[39] The use of an object such as a belt is not necessarily excessive,[40] but it certainly is a "relevant" consideration.[41] Despite the lack of contextual information, A.B.'s statements to Dr. Carter supported the inference that M.F. employed the belt against her harshly and with some regularity when she was disobedient. At five years of age, she was young to be "whipped." No extenuating circumstances were shown. And the court could infer their absence, and a lack of moderation and reasonableness, from the falsity of M.F.'s denial that he had hit A.B. at all.

■ Nonetheless, to be upheld, "a finding of neglect must embody a correct understanding of the relevant statutory terms."[42] That corporal punishment exceeds the scope of "legitimate parental 'discipline'" does *not* mean it meets the statutory definition of "abuse,"[43] or that the child is in imminent danger of being abused. The legislature has decided that even excessive physical punishment does not amount to "abuse" unless it entails the infliction of either "physical or mental injury."[44] As to the former, the term "physical injury" is defined to mean "bodily harm greater than transient pain or minor temporary marks."[45] The evidence did not show that A.B. (or N.D.) ever was threatened with such physical injury by her parents' practice of corporal punishment, or that either child faced the prospect of such injury in the future. While we should not be understood as condoning the use of physical discipline, hitting a child with a belt (or a ruler) might well cause no more than "transient pain or minor temporary marks," depending on how it is done.[46] So far as appears, neither A.B. nor N.D. had endured worse than that. Their infant sister had, of course—much worse. But Ma.F.'s physical mistreatment was not attributed to the same sort of discipline imposed on her older (and not so vulnerable)

---

**39.** D.C.Code § 16–2301(23)(B)(i) (2009 Supp.); *see also In re G.H.,* 797 A.2d 679, 684 (D.C.2002) ("Our neglect statute does not proscribe all physical chastisement of a child by a parent or by one acting *in loco parentis.* ... The question is whether the physical force used ... was reasonable under the facts and circumstances of the case.... The great preponderance of authority is to the effect that a parent has a right to punish a child within the bounds of moderation and reason, so long as he does it for the welfare of the child.") (internal quotation marks, citations and brackets omitted).

**40.** *See In re S.K.,* 564 A.2d 1382, 1391 (D.C. 1989) (Schwelb, J., concurring in part and dissenting in part) (suggesting that "two or so blows with a belt would not, under ordinary circumstances, be sufficient to constitute child abuse within the meaning of the statute").

**41.** *In re Kya. B.,* 857 A.2d 465, 471 (D.C. 2004).

**42.** *In re L.H.,* 925 A.2d 579, 581 (D.C.2007).

**43.** *See id.* at 581–82.

**44.** D.C.Code § 16–2301(23)(A)(i) (2009 Supp.). The statutory definition of the term "abused" also encompasses "sexual abuse or exploitation" and "negligent treatment or maltreatment," which are themselves defined terms. *See* D.C.Code § 16–2301(23)(A)(ii), 23(A)(iii), (24), (25), (31), (32). These other meanings of the term "abused" are not implicated in this case.

**45.** D.C.Code § 16–2301(30) (2009 Supp.). *See, e.g., In re L.H.,* 925 A.2d at 582 ("[B]y defining physical injury as it does, the statute makes clear that not every such act (including even 'striking a child with a closed fist') is '*per se* physical abuse.'") (quoting D.C.Code § 16–2301(23)(B)(i)(II)).

**46.** *See In re K.S.,* 966 A.2d 871, 880 n. 15 (D.C.2009).

sisters, nor to the same causes, and in the absence of some such linkage, there was no ground to find that it portended comparable mistreatment in store for them.

The trial court did not find, and the government cites no record evidence showing, that A.B. or N.D. had suffered or was threatened with "mental injury," defined as "harm to a child's psychological or intellectual functioning, which may be exhibited by severe anxiety, depression, withdrawal, or outwardly aggressive behavior, or a combination of those behaviors, and which may be demonstrated by a change in behavior, emotional response, or cognition."[47] It is noteworthy that Dr. Carter expressed no such opinion in the case of A.B.[48] And the government presented no evidence that A.B. or N.D. had witnessed the abuse of their infant sister.[49]

Accordingly, for insufficiency of proof, we reverse the trial court's judgment that A.B. and N.D. were neglected children.

## IV. Conclusion

For the aforesaid reasons, the judgment in No. 06–FS–1012 (the neglect adjudication of Ma.F.) is affirmed. The judgments in Nos. 06–FS–1010 and 06–FS–1011 (the neglect adjudications of A.B. and N.D.) are reversed.

*So ordered.*

---

47. D.C.Code § 16–2301(31).

48. To the contrary, see footnote 29, *supra. Cf. In re K.S.*, 966 A.2d at 880–81.

49. It might be suggested that the parental use of excessive corporal punishment, even if it did not place A.B. and N.D. in imminent danger of "abuse," by itself meant that the two girls were "without proper parental care or control" (and hence were neglected children within the meaning of D.C.Code § 16–2301(9)(A)(ii)). That was not the trial court's rationale, nor is it the District's argument on appeal. We believe the statutory language cannot be stretched so far. Not every im-proper parenting method constitutes neglect, and ordinarily, we think, instances of excessive physical discipline (not amounting to "abuse") would not, without more, justify a finding that a child lacked proper care and control. *Cf. In re L.H.*, 925 A.2d at 583 (holding that a "single act of corporal punishment[,] even considering it to be excessive," did not support the conclusion that the child was "left without necessary care and supervision"). A pervasive regime of unreasonable and immoderate physical punishment would be a different story, but that story is not told by the record here.